Mr. William C. Thomas — Mr. William L. Stringham
California First Bank
503 B Street
San Diego, California, 92101

Mr. Jeffrey Harris — Mr. Irving Harris
The Camargo Trust
Porter, Wright, Morris & Arthur
1650 Atrium One
201 East Fourth Street
Cincinnati, Ohio, 45202

Mr. F. Hall Webb — Mr. Donald A. Delaporte
Chemical New York Corporation
c/o Chemical Bank
277 Park Avenue
New York, New York, 10172

Mr. Robert Greene
AmeriTrust Company
900 Euclid Avenue
Cleveland, Ohio, 44101

Mr. Gary Sieveking
First National Bank of Louisville
P. O. Box 36000
Louisville, Kentucky, 40232
 –or–
101 South Fifth Street
8th Floor
Louisville, Kentucky, 40232

Mr. Robert Lowrie — Mr. J. Frederic Wiese, Jr.
The Indiana National Bank
One Indiana Square
Indianapolis, Indiana, 46266

Mr. William F. Martson, Jr. — Mr. Grant Stelmer
The Niskanen Interests
Tonken, Torp, Galen, Marmaduke
& Booth
1800 Orbanco Building
1001 S.W. First Avenue
Portland, Oregon, 97204

### EX OFFICIO NON–VOTING

Mr. Thomas Rose
The Federal Deposit Insurance Corporation
550 17th Street N.W.
Washington, D.C. 20429

Mr. John R. Grimes — Mr. Marshall L. Zissman
The First National Bank of Chicago
One First National Plaza, 0126 — Mr. Robert V. Herbert
Chicago, Illinois, 60670

### NON–VOTING INVITEES

Vernon Teofan, Esq.
Insurance Commissioner of Arkansas
c/o Freytag, Marshall, LaForce, Rubenstein
 Stutzman & Teofan
1800 Skyway Tower
Dallas, Texas, 75201

Emil J. Molin
Deputy Rehabilitator
Insurance Commissioner of Indiana
c/o University Life Insurance Company
P. O. box 68215
3500 DePauw Boulevard
Building No. 3, 11th Floor
Indianapolis, Indiana, 46268

In re SAPOLIN PAINTS, INC., Debtor.

In re WOOLSEY MARINE INDUS-
TRIES, INC., Debtor.

Bankruptcy Nos. 180–01691–21,
180–01807–21.

United States Bankruptcy Court,
E.D. New York.

March 9, 1984.

Angel & Frankel, P.C., Davis, Polk & Wardwell, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, Attorneys for Creditors' Committee.

Stroock & Stroock & Lavan, Ryan & Silberberg, New York City, for debtor.

Main, Hurdman & Cranstoun, Danbury, Conn., Accounts for Creditors' Committee and for debtor-in-possession.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

In this liquidating Chapter 11 proceeding the attorneys and accountants who have performed professional services in connection with the administration of this proceeding are seeking the allowance of compensation for such services and reimbursement of their expenses. All are in the nature of final allowances except the applications of Stroock & Stroock & Lavan ("S & S & L") and Main, Hurdman & Cranstoun ("Main").

Sapolin Paints ("Sapolin") filed for relief under Chapter 11 on April 8, 1980; Sapolin's wholly owned subsidiary, Woolsey Marine Industries, Inc. ("Woolsey") filed on April 14, 1980. On April 22, 1980, the Court ordered joint administration of the two proceedings. At a public auction held under the auspices of the Court on June 12, 1980 the assets of the two Debtors were sold in one package for the sum of approximately $2.6 million.

Distribution of the proceeds of the auction to general creditors has been delayed by several factors: uncertainty as to the amount the Debtors' largest secured creditor, Chemical Bank, would realize from its security; disagreement between the Woolsey and Sapolin Creditors' Committees regarding the appropriate division between the creditors of the two companies; and litigation arising out of the sale and other disputes. In the interim the estate grew to approximately $3.3 million of which a substantial fraction has already been distributed to priority creditors.

In accordance with the requirements of 11 U.S.C. § 330 and Bankruptcy Rule 2002(a)(7) (which replaces the former Bankruptcy Rule 11–24) notice of the applications for allowances was sent all creditors. No creditor appeared at the scheduled hearing to object to the amounts requested. However, Frederick Kremer, president and chief executive officer of both Sapolin and Woolsey and a member of the Board of Directors of these companies expressed his disappointment at the long time the proceeding had gone on. While Mr. Kremer was very supportive of the application of Stroock & Stroock & Lavan and of Ryan & Silberberg, both of whom had been employed by the Debtor, he was critical of the work of Main and of the attorneys for the Creditors' Committees. Because of Mr. Kremer's long and close involvement with these proceedings, the Court has taken his

comments into consideration in reaching its conclusions.

## I. THE CONTROLLING LAW

Analysis of attorneys' fees in bankruptcy proceedings begins with Sections 330 of the Bankruptcy Code, 11 U.S.C. § 330 (1980), which provides that the bankruptcy court, after notice and hearing, may award:

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

■ The Code rejects the concept that notions of economy should govern the allowance of attorney fees in bankruptcy cases. Otherwise, the same criteria as were developed under the Bankruptcy Act continue to be applicable. See, e.g., *Matter of Hamilton Hardware Co., Inc.*, 11 B.R. 326 (Bkrtcy.E.D.Mich.1981); *In re Garland Corp.*, 8 B.R. 826 (Bkrtcy.D.Mass.1981); *In re J.R. Elkins*, Bankr. No. 181–12593–260, Unreported Decision, Nov. 17, 1983) (Duberstein, B.J.) (Bkrtcy.E.D.N.Y.1983); 2 *Collier on Bankruptcy*, ¶ 330–05[2] at 330.05 (15th Ed.1980). They include: (1) the nature of the services rendered; (2) the difficulties and complexities encountered; (3) time necessarily expended; (4) the results achieved; (5) the burden the estate can safely bear; (6) the size of the estate; (7) duplication of services; (8) professional standing, ability and experience of the applicant; and (9) fairness to each applicant. *Surface Transit, Inc. v. Saxe, Bacon & O'Shea*, 266 F.2d 862, 865 (2d Cir.1959); *In re Paramount Merrick, Inc.*, 252 F.2d 482, 485 (2d Cir.1958); *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1298–99 (5th Cir.1977).

Increasingly, however, the "lodestar" approach is coming to dominate. *In re Casco Bay Lines, Inc.*, 25 B.R. 747, 755 (Bkrtcy. App. 1st Cir.1982). The lodestar is the result of multiplying the number of hours *reasonably* expended on the case by a *reasonable* hourly rate. *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980). After arriving at this figure, further adjustment can be made for factors such as the quality of representation and delay in receipt of payment. *In re Casco Bay Lines, Inc., supra*, 25 B.R. at 756.

The lodestar approach requires accurate records of both the amount of time spent and the manner in which it was spent.

"Adequate time records are essential to the court in carrying out its duty to determine how much work was productive or necessary, and how much work required treatment by experienced attorneys." *In the Matter of Interstate Stores, Inc.*, 437 F.Supp. 14, 16 (S.D.N.Y. 1977).

See also *In re Meade Land & Development Co.*, 527 F.2d 280, 283 (3d Cir.1975); *In re Orbit Liquor Stores*, 439 F.2d 1351, 1353 (5th Cir.1971); *In the Matter of Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817, 820 (9th Cir.1976); *In re Hudson & Manhattan Railroad Co.*, 339 F.2d 114, 115 (2d Cir.1964).

Addressing the question of the proper calculation of a lodestar in a civil rights case, Judge Bartels said: "While the use of reconstructed time records is permissible, the time must be reconstructed with reasonable specificity and must exhibit reasonable reliability. Uncertainties that arise because of poor records should be resolved against the applicant." *New York State Association for Retarded Children, Inc. v. Carey*, 544 F.Supp. 330, 338 (E.D.N.Y. 1982). (Citations omitted). His opinion continues: "Lack of documentation is not an evil in itself, but it creates problems precisely to the extent that it makes the court's task of determining the reasonableness of time claimed very difficult." *Id.* at 339.

■ What the Court must avoid is allowing a double charge for the same service where attorneys are acting jointly in the same capacity. *Cle-Ware Industries, Inc. v. Sokolsky*, 493 F.2d 863 (6th Cir.1974); *In re Crutcher Transfer Line, Inc.*, 20 B.R. 705, 710 (Bkrtcy.W.D.Ky.1982). The debtor's estate should not bear the burden of duplication and if not avoided by counsel it should be disallowed by the court. *In re Liberal Market, Inc.*, 24 B.R. 653, 658 (Bkrtcy.S.D.Ohio 1982). In a case involving multiple attorneys and a large number of claimed hours an across-the-board reduction is a necessary, but fair, expedient to correct for excessive or duplicative hours.

■ Furthermore, not all services should carry the same compensation. Correspondence and telephone conversations, unless the substance is set forth, should be compensated at a lower rate than truly legal services irrespective of the experience and competency of the attorney who performs them. *In re Doyle-Lunstra Sales Corp.*, 19 B.R. 1003 (Bkrtcy. 7th So.Dak.1982); *In re Hamilton Hardware Co.*, 11 B.R. 326, 331 (Bkrtcy.E.D.Mich.1981).

With this background in mind the task before the Court is to address individually the merits of each application. Before doing so, however, the Court wishes to commend all the attorneys for the high calibre of their work. All are expert in the bankruptcy field; all deservedly enjoy the highest professional standing. Their individual applications will now be evaluated.

## II. THE ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION

### A. STROOCK & STROOCK & LAVAN

■ S & S & L have represented the two Debtors in this proceeding since it was retained on January 8, 1980. At the time of its retention it received a fee of $75,000.00. On December 4, 1980 this Court authorized the payment to it of interim compensation in the amount of $85,790.75. This represented exactly half of the figure it had requested as an interim allowance and as reimbursement of expenses for the period from January 8, 1980 to August 31, 1980, after deducting the $75,000.00 retainer previously received.

Notice was sent to all creditors to advise them that the total compensation requested by S & S & L at the present time is $345,435.20 and that the reimbursement for expenses requested is $107,711.91. (At the hearing, S & S & L advised the Court that the total given for the reimbursement of expenses was inaccurate and the total amount for which reimbursement was sought was $36,675.88).

The figure of $345,435.20 is made up of two components: a charge predicated on hours worked for the period from August 31, 1980 to September 30, 1983 of $290,-435.20, and a premium of $55,000.00 for the achievement of outstanding results. But it appeared from the applications filed by S & S & L that the firm is seeking more than compensation for the period from August 31, 1980 to September 30, 1983: it is renewing its application for compensation for services performed from January 8, 1980 to August 31, 1980 as to which it had previously received interim compensation equal to half the amount requested. In other words, it wants an allowance of $423,-848.62, not simply $345,435.00. The disbursement for which reimbursement is requested also relates to two time periods: January 8 to August 31, 1980 and August 31, 1980 to September 30, 1983.

The bonus of $55,000.00 is requested because of the substantial benefits S & S & L claimed to have conferred upon the estate "as a result of the quality of professional services rendered by S & S & L, the ingenuity manifested, the skill, creativity and tenacity at negotiating and working out compromises among conflicting parties, the uniqueness of Sapolin and Woolsey, the size of the augmentation of the distribution to creditors directly attributable to the efforts of S & S & L (particularly in respect to the settlements respecting the Pension Plan, Union claims, and claims of MIG and Chemical Bank), the standing at the Bar of the members of S & S & L as well as the

attorneys for S & S & L's adversaries, the substantial amount of work done, the time consumed, and the skills and expertise required (particularly as this was one of the first substantial reorganization cases brought under the Bankruptcy Code of 1978)."

Although the application is called one for interim compensation, Stroock forecasts that future legal services will be minimal and has advised the Court that the application should be treated for purposes of distribution as a final one.

By and large the Court agrees with S & S & L's description of its services for which three partners bear major responsibilities: Jack Gross, John F. Scheffel and Sheldon I. Hirshon. The performance of S & S & L in this case was outstanding in all respects and was of the highest quality. Where a matter could be settled by negotiation, it was settled; where it had to be brought before the Court, it was done so in the most professional manner possible with clear, lucid and well-documented papers, with the possible exception of the present application and the relevant notice which the Court has found confusing and, to some extent, contradictory.

As S & S & L's application points out, because this case was one of the first liquidating Chapter 11's under the Code, it was necessary to proceed in a number of areas without any guidance from precedents. Ingenuity was needed and supplied. New problems were met and resolved. In a number of respects S & S & L augmented the estate. This was possible because what remained after the sale of the Debtor's physical assets were legal problems involving such matters as the disposition of a pension fund. The firm also successfully resolved the largest pending claims against the estate. Perhaps S & S & L's greatest achievement, engineered by Mr. Scheffel, was persuading the Sapolin and Woolsey Creditors' Committees to negotiate their differences.

The records submitted in support of the number of hours stated to have been worked have been meticulously prepared.

They permit the Court to assess the necessity for the work and the legitimacy of the time assigned to its performance. The mixed hourly rate requested, $108.00, is the lowest of any of the professionals filing application with this Court.

The Court has carefully reviewed the two relevant applications and based on them and on the Court's own intimate knowledge of the case, it would deem the time spent by S & S & L to merit compensation at the firm's regular hourly rate but for other considerations. Excellent as was the work of S & S & L, the size of the estate must be taken into account. Through December 31, 1983, which is a longer period than that for which S & S & L is now seeking compensation, the total estate reached $3,369,000.00. After payment of certain priority claims and administrative expenses and other charges the balance left is about $2,288,-000.00. Legal fees must bear some reasonable relationship to these figures.

Another factor is the nature of the notice sent creditors regarding the fees now under consideration. The notice indicated that if the Court allowed S & S & L the maximum it was requesting for its services, it would be allowed $345,435.20. It was in terms of this maximum that the Court originally allowed S & S & L $305.435.20. What the Court temporarily overlooked, misled by the notice, was that S & S & L was in fact seeking $423,848.62, not $345,-435.20. This was in addition to the $75,-000.00 retainer and the $78,413.42 it had already received as interim compensation. This would result in total compensation, still interim in nature, of $577,262.04.

Keeping in mind the comparatively modest estate, the Court concluded that despite the excellence of work done by S & S & L it would be unfair to creditors to allow legal fees of this magnitude. Accordingly, S & S & L is not being allowed its full hourly rate. The total amount which will be allowed for all work through September 30, 1983 is the amount S & S & L gave notice it was requesting which is $345,435.20. No bonus is being allowed.

This means that S & S & L will have received as interim compensation for work through September 30, 1983 the amount of $498,848.62. In allowing this amount the Court is relying on the statement of S & S & L that while the allowance is denominated as interim allowance it is in practical effect, a final allowance. The Court counts on S & S & L to hold down further legal expenses to an absolute minimum.

■ The Court has reviewed the total disbursements requested in the interim application covering the period through August 31, 1980 and in the second application covering the period through September 30, 1983. In connection with the earlier application, the Court had allowed $7,377.33 representing 50 percent of the amount requested on account of disbursements. The Court is disallowing as inappropriate as disbursements the amount shown for "Meals and Transportation", "Meals", "Word processing" and "Document Review" on the two schedules of disbursements. These total $5,649.92. The balance of the disbursements shown are being allowed. After subtracting the amount previously allowed on account of disbursements, $7,377.33, the result is $23,603.63.

### B. RYAN & SILBERBERG

■ Ryan & Silberberg, who were retained by the Debtors on March 7, 1980, are asking compensation for services which they performed in the two proceedings. The total amount the firm is requesting is $28,497.50 for its services and $1,399.32 as reimbursement for expenses. The firm has already been paid a $25,000.00 retainer, so what it is seeking is the difference between that figure and $29,896.82, or $4,896.82. The firm has attached to its application a detailed time sheet. They record the total hours spent on this matter to be 237.5 hours, all of it by the two partners and all, with the exception of one-half hour, the work of Gerald E. Fogerty, a partner. His hourly rate is stated to be $120.00.

The application is strongly supported by Mr. Kremer, who feels that Mr. Fogerty was particularly helpful to him.

The Court has examined the time sheets which fully support the hours claimed, except for the fact that since this firm evidently records its time in units of tenths of the hour no telephone conversation is credited with taking less than one-tenth of an hour, or six minutes. Longer conversations are recorded as taking two-tenths or three-tenths of an hour. An arbitrary assumption of this character, although understandable as an efficiency measure, tends to overstate hours where, as here, telephone conversations account for a great number of entries.

Furthermore, the Court is not persuaded that all the time recorded represents services appropriate for reimbursement from the estate created by the sale of the assets of Sapolin and Woolsey. Some of the services appear to have been performed for Sapolin's stockholders who have no interest in the estate.

Taking all relevant factors into account, the Court believes that the $25,000.00 retainer previously received by the firm constitutes reasonable compensation for its work. No more will be allowed.

■ As for the expenses of this firm, all appear to be reimbursable except the $503.47 shown as due to "Transportation, Meals". Accordingly, Ryan & Silberberg is being allowed $895.85 as reimbursement for expenses.

### III. THE ATTORNEYS FOR THE CREDITORS' COMMITTEE

Before turning to the applications of the three firms representing the two Creditors' Committees, some observations are appropriate.

In these proceedings, except for the problem of allocation as between the Sapolin and Woolsey creditors discussed later herein, there was relatively little the attorneys for the two Creditors' Committees needed to do to protect their principals. Within weeks of the filing of the petition all the assets of the two debtors were liquidated in a single successful auction

terminating their active business existence. All the proceedings subsequent to that litigation involved purely legal problems which were handled superbly by the attorneys for the Debtors, S & S & L.

Had the representation given by S & S & L been less excellent, it might have been necessary for the attorneys for the Creditors' Committees to involve themselves actively in the legal problems which arose, but, as it was, what they did in this connection, although excellent and helpful to the Court, was largely redundant. Except for reinforcing the work of Stroock & Stroock & Lavan, there was little that the attorneys for the Creditor's Committee needed to do other than to police what was going on and keep themselves advised of what the debtors' counsel was doing. This fact must be taken into consideration in evaluating their applications.

## A. THE ATTORNEYS FOR THE SAPOLIN CREDITORS' COMMITTEE

■ The attorneys for the Sapolin Creditors' Committee, who have received no compensation to date, are asking $107,161.25, plus reimbursement of expenses in the amount of $710.35. Two firms served jointly as counsel, Angel & Frankel, P.C. ("A & F") and Otterbourg, Steindler, Houston & Rosen, P.C. ("Otterbourg"). According to their joint petition, A & F expended 405 hours on this matter, more than half representing work done by Bruce Frankel, a partner. The Otterbourg firm spent 289 hours, of which better than two-thirds consisted of work by Morton Gitter, a partner. The hourly time charge is said to work out to $147.05 per hour.

At the request of the Court, both firms have submitted time sheets. The record submitted by Otterbourg is a computer printout which provides minimal information with respect to the work performed. Many of the entries simply record telephone calls. This computer printout does not permit the Court to evaluate the nature of the work nor the substance of what was discussed in the conversations recorded. On the basis of Otterbourg's normal hourly rate the value of the services performed by the firm is stated to be $45,760.50.

Of course, this Court has knowledge, apart from the time records, of the work done by Otterbourg. Based on its familiarity with these proceedings, the Court is aware of the important role played by Mr. Gitter, in particular, in helping with the settlement of the allocation problem between the Woolsey and Sapolin creditors.

The time records supplied by A & F are somewhat more detailed than those of its co-counsel but most of the entries simply record telephone calls and the receipt and review of documents.

Judging by its time records, A & F follows the practice of recording all telephone calls and the reception of all correspondence in the terms of fifths of an hour, or 12 minutes. Yet, common experience tells us many telephone calls take substantially less than 12 minutes. Indeed, the telephone company's rates are predicated upon the premise that most telephone calls terminate within three minutes. If telephone calls were a small part of the charges shown by A & F, the distortion would be small but since the calls represent approximately half of all the entries the effect on the hours claimed is substantial.

Equally inflationary is the practice of recording the reception of any communication, no matter how insignificant, as taking a minimum one-fifth of an hour. Thus, for example, according to the time records, one-fifth of an hour was expended in the preparation of a letter to obtain a copy of page 11 inadvertently missing from a disclosure statement sent A & F, another fifth of an hour was consumed by the reception of the missing page. At an hourly rate close to $150.00 an hour, the missing page would thus cost the estate nearly $60.00.

Reviewing the time records of A & F and the Court's own records, it now appears that joint representation by the two firms of the same Creditors' Committee increased the number of hours for which compensation is now being sought. The Court's records show that representatives of both

firms were present at several hearings. A & F's time records reflect conferences and communications between the two firms that would have been unnecessary had a single firm handled the matter. Many of the documents received and reviewed by A & F were those prepared by its co-counsel. Many of the conferences involved representatives of both firms. A close analysis cannot be made of the extent of the duplication because of the paucity of detail supplied by Otterbourg. Nevertheless, it is clear that there was substantial duplication.

Based on an intensive review of the applications of the two firms and of the supporting time records, this Court has concluded that no more than $80,000.00 should be allowed the attorneys for the Sapolin's Creditors' Committee. It should be noted that this compensates them for the 700 hours claimed at a higher hourly rate than the $108.00 per hour that S & S & L is being allowed.

Of the expenses for which reimbursement is sought, all appear appropriate except the charge of $22.00 for "Meals". Accordingly, the firm will be allowed reimbursement of $688.35 in expenses.

## B. THE ATTORNEY FOR THE WOOLSEY CREDITORS

■ Davis, Polk & Wardwell ("Davis"), the attorney for the Woolsey Creditors' Committee, seek a final allowance of $94,500.00. No interim allowance for fees has been awarded this firm, although an interim payment of costs in the amount of $4,406.14 was allowed on July 27, 1981. Davis' request covers the period from May, 1980, when it was first retained, to date. The total number of hours for which compensation is requested total 851.6 hours; the average hourly rate requested equals $110.97.

The time records accompanying the application substantiate the number of hours billed and contain an adequate description of the nature of the services rendered. This law firm's performance was consistently of high calibre. The work done by Davis in this proceeding manifested the highest skills. Everything was clear, carefully researched, and every paper was a model of its kind.

However, most of the work for which compensation is requested never came to the attention of the Court and remains in the files of Davis. It was generated by a single controversy: how the proceeds of the sale of the Sapolin-Woolsey assets as one package were to be allocated to the creditors of each. On paper, Woolsey, a wholly-owned subsidiary of Sapolin, was a solvent corporation, and, therefore, its creditors claimed they should be paid 100 percent. On the other hand, Sapolin's creditors maintained the Sapolin's assets had furnished the greater portion of the actual proceeds of the sale and thus would not consent to any plan which would give the Woolsey creditors 100 percent at their expense. When it appeared that the matter had been settled, the controversy broke out again because, due to an increase in the assets to be distributed, it appeared that the formula would result in a greater difference in the treatment of the Sapolin and Woolsey creditors than had been anticipated.

Davis prepared to fight the matter out, evidently meticuously assembling all the relevant facts and doing extensive research on the legal principles applicable. The work proved unnecessary when a second settlement was reached, but there can be no question that by the time the matter was settled Davis was thoroughly prepared to litigate all facets of the issue of substantive consolidation. According to its application, and fully supported by its time records, it had assembled evidence, undertaken legal analysis, and drafted, although never served, a memorandum of law marshalling the evidence.

However, despite the high quality of the work, and the relatively low hourly charge involved, $110.90, the Court does not believe it would be appropriate to allow Davis the full amount, $94,500.00, it has requested.

For a number of reasons the Court will not require the estate to bear the full burden of the still-born litigation respecting the allocation of the estate. It must have been evident at all times that litigation between the two groups of creditors would have consumed the estate to the detriment of them all and thus was to be avoided if at all possible. Furthermore, when the controversy broke out again the amount involved so far as the Woolsey creditors were concerned, was in the neighborhood of $60,-000.00. Reviewing the file and in particular the hearing of April 4, 1983, this Court has concluded that, as Mr. Gitter, representing the Sapolin Committee, pointed out at the time, the controversy should have been settled far earlier than it was which would have eliminated many hours of the work for which Davis now seeks reimbursement.

Accordingly, the Court will allow Davis only $85,000.00 as compensation for its services, bearing in mind the ultimate result of its labor.

Turning to the reimbursement of expenses, not all the expenses for which Davis seeks to be repaid appear to be appropriate. Davis requests reimbursement for the expenses of Michael L. Jordan, identified as a member of the Creditors' Committee. He claims to have spent in connection with this proceeding, $2,055.20; no detail is supplied.

 The Bankruptcy Courts are divided on the issue as to whether the expenses of a creditor may ever be reimbursed, but even those courts which allow such reimbursement require that it be demonstrated that the expenditures were actual and necessary and made a substantial contribution to the case. *In re Farm Bureau Services, Inc.*, 32 B.R. 69, 71 (Bkrtcy.E.D.Mich.1982). No such showing had been made here. The Court therefore is not going to allow reimbursement of Mr. Jordan's expenses.

 The Court is also not going to permit reimbursement for the expense of "Wordprocessing" or for Lexis computer research. In the view of the Court, word-processing is an alternative to secretarial services which constitute part of the normal overhead of a law office and is compensated for by the hourly rate charged. Similarly, Lexis research is simply another method for performing research which also constitutes part of the services which are included in the hourly rate. Davis will be allowed reimbursement for the balance of its expenses which total $8,857.02.

## IV. ACCOUNTANTS

Main Hurdman & Cranstoun ("Main") which served as accountants for the Creditor's Committee and for the debtors-in-possession, are requesting interim compensation for their services in the amount of $98,069.50, plus reimbursement of expenses in the sum of $3,278.00. According to Main's application, the services they have performed to date have a value of $141,000.00. Since they already have received $42,930.50, they are asking the balance, or $98,069.50.

On September 26, 1980 this Court authorized Main's retention fixing the maximum allowance to them at $45,000.00, plus disbursements; this maximum was increased by order dated February 20, 1981 to $81,-000.00, plus disbursements, and on April 6, 1982 to $116,000.00, plus disbursements.

No objection, except by Mr. Kremer, has been raised to allowing Main the full amount requested, $141,000.00, plus disbursements.

Main has submitted time records substantiating its claim that at its regular time charges the value of the work performed to date is $141,000.00. With respect to disbursements, the only explanation furnished for a lump sum charge of $3,278.00 is:

> "Out-of-pocket expenses for report, production, temporary help, photocopying, travel and messenger services."

Rule 18(a)(1) of the Local Rules of the United States Bankruptcy Court for the Eastern District of New York provides as follows:

> *"Retention Order.* No attorney or counsel shall be retained, nor shall he be

allowed a fee from the estate of the debtor, unless his retention has been authorized by an order of the Court. An order authorizing retention of accountant shall *fix the maximum amount of his compensation.*" (Emphasis added).

The purpose of placing a cap on the order authorizing retention of an accountant with respect to the amount of his compensation is to maintain control over the expenses that are to be paid out of the estate at the expense of creditors generally. Main's attention was drawn to the Rule when its application for interim compensation was heard on April 28, 1981. Indeed, subsequent to that hearing an Order was submitted increasing the maximum compensation allowed from $81,000.00 to $116,-000.00. However, no Order has been submitted increasing Main's compensation over and above $116,000.00. Nevertheless, Main kept performing services long after services of a value of $116,000.00 had been rendered and it now seeks compensation for these excess services.

 It is well established that professional services rendered are not compensable from a debtor's estate if such services have not previously been authorized by the bankruptcy court. That such services may have been beneficial or valuable to the estate and performed in good faith is immaterial, as is hardship to the unauthorized professional. *Matter of Futuronics Corp.*, 655 F.2d 463, 469 (2d Cir.1981); *In re Hydrocarbon Chemicals, Inc.*, 411 F.2d 203, 206 (3rd Cir.1969); *In re Mork*, 19 B.R. 947, 948–49 (Bkrtcy.D.Minn.1982); *In re Garland Corp.*, 8 B.R. 826, 828 (Bkrtcy.D. Mass.1981); *In re Morton Shoe Companies, Inc.*, 22 B.R. 449, 450 (Bkrtcy.D.Mass. 1982); *Matter of Hucknall Agency, Inc.*, 1 B.R. 125, 126–27 (Bkrtcy.W.D.N.Y.1979) (an accountant who performed over $14,000 worth of professional services denied compensation because his employment had not been authorized); 2 *Collier on Bankruptcy*, ¶ 327.02 (15th ed.1981).

The rule prohibiting compensation for unauthorized services must be enforced in order to "maintain control of costs". *In re*

*Garland Corp.*, 8 B.R. 826 (Bkrtcy.D.Mass. 1981). "Otherwise the necessary power of the 'Court to ensure that assets of the estate are not wasted would be undermined." *In re Morton Shoe Companies, Inc.*, 22 B.R. 449, 451 (Bkrtcy.D.Mass. 1982); *In re Fiberglass Speciality Co., Inc.*, 12 B.R. 119, 121 (Bkrtcy.D.Minn.1981). "Only in this way can claims be avoided for volunteered services which may or may not have been such as what would have authorized." *In re Eureka Upholstering Co.*, 48 F.2d 95, 96 (2d Cir.1931). Work in excess of the amount authorized, is just as unauthorized as work done without an order.

We are not dealing here with a mere technicality. The necessity for an order affords an opportunity to interested parties to object to the requested expenditures as unnecessary. In this case, Mr. Kremer, the President of the debtors who has followed these proceedings closely, made it clear that in his view much of the work done by Main was unnecessary. Mr. Lewis, counsel to the Woolsey Committee, appeared to agree that the work had in fact accomplished little for reasons not within the control of the accountants. Accordingly, there is no reason to assume that the work done by Main in excess of $116,000 would have ever received the authorization of the Court.

 Since Main had no authorization to perform services in excess of $116,000 and Main has already received $42,950.50, the maximum amount which may be awarded at the present time is $73,069.50.

Main would be entitled, in addition, to the reimbursement of its expenses if they were properly documented and otherwise appeared appropriate. But Main's application does not meet these standards. A lump sum is asked for expenses which include "temporary help". Temporary help is not only an item of overhead which should be covered in the charge per hour but presumably the hours worked by such temporary help are already included in the time for which Main asks reimbursement. There appears, therefore, to be a duplication of

charges. Main appears to be asking both compensation for the hours worked by temporary help and reimbursement as an expense of the amount paid temporary help. Since on the basis of the figures now before the Court it cannot determine what is reimbursable and what is not, no allowance will be made Main for reimbursement of its expenses.

Orders consistent with this Opinion have been, or are being, issued.