**In the Matter of F/S AIRLEASE II, INC., Debtor.**

**Bankruptcy No. 84–1628.**
**Motion No. 85–2157.**

United States Bankruptcy Court,
W.D. Pennsylvania.

April 14, 1986.

---

Philip J. Nathanson, Kasdin & Nathanson, Chicago, Ill., for petitioner Lewis Simon and S–J Corp.

Alan M. Epstein, New York City, Paul M. Singer, Pittsburgh, Pa., for Greycas, Inc. (secured creditor).

Daniel J. O'Neill, New York City, M. Bruce McCullough, Pittsburgh, Pa., for F/S Airlease II, Inc. (debtor).

Stoddard Platt, New York City, for Swig Inv. Co. Aircraft Trust No. 1 (owner).

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before this Court is an Application For Professional Fees By Petitioner, Mr. Lewis Simon and S–J Corporation ("S–J"), averring that it procured a lease at the Debtor's request, that said lease constitutes the sole asset of the estate, and that it should be compensated in the amount of $450,000.00, based upon the fees received in past conduct with the Debtor and upon the fees charged for such services in the marketplace.

F/S Airlease II, Inc. ("Debtor") has objected to the payment of the compensation requested, claiming, that while S–J should be compensated to some degree for the services performed, the amounts requested are excessive and would deter the formulation of a proposed Plan of reorganization.

Greycas, Inc. ("Greycas"), the largest secured creditor, has objected to the payment of any compensation to S–J, asserting *inter alia* that S–J has no legal basis for its claim as prior Court approval was not secured.

Swig, the owner of the aircraft, now requests that the Court impose a $100,-000.00 limit to S–J's compensation—an amount which Swig refused to accept during the initial negotiations.

The parties conducted an extensive hearing on the various issues and offered complete testimony, both at the hearing and through depositions. The parties have also submitted very complete and thoroughly researched briefs, proposed Findings of Fact and Conclusions of Law. Based upon the various pleadings, memoranda, and the hearing thereon, this Court concludes that S–J is entitled to compensation in the amount of $450,000.00.

## FACTS

The Debtor is a single-asset corporation, which has the sole purpose of leasing and remarketing a certain Boeing 737–222 aircraft. This aircraft was purchased by the Debtor in July of 1980, and financing for the purchase was obtained from Greycas. The aircraft was subsequently sold and repurchased several times, the final purchaser being the Swig Investment Company Aircraft Trust No. 1 ("Swig"). Swig subsequently leased the aircraft to the Debtor for an 18-year term. At all times, Greycas continued to hold a security interest and was to be repaid from the rental proceeds received as a result of the Debtor's releasing of the aircraft.

In February of 1980, the Debtor entered into an initial agreement with S–J, hiring it as a leasing agent to find leases for various aircrafts. In July of 1980, S–J successfully arranged for the lease of the Boeing 737–222 aircraft to Air Florida. Soon thereafter, a disagreement arose between the Debtor and S–J as to the appropriate compensation due S–J for its services. Litigation was instituted in the United States District Court for the Northern District of Illinois, which ultimately was resolved by a Settlement Agreement dated May 27, 1983. This Agreement directed that S–J would be entitled to compensation in the amount of one-half of one month's rent for each year of releasing, and would give S–J the remarketing rights to this and other aircraft, subject to the rights of the various owners and secured lenders. Additionally, the Settlement Agreement stated that S–J had a right to payment only when the Debtor received payment.

On July 3, 1984, Air Florida, the lessee of this aircraft, filed a Chapter 11 bankruptcy, which effectively terminated the aircraft lease, leaving the aircraft available for release or sale. The Debtor immediately contacted S–J, urging it to assist in the search for a new lessee. On July 20, 1984, S–J

sent a letter to the Debtor proposing to remarket the aircraft for a flat fee of $100,000.00 plus expenses, irrespective of the new lease terms. On July 30, 1984, S–J forwarded a second letter to the Debtor, again offering to act as the leasing representative for the $100,000.00 flat fee, plus expenses. S–J specified that it needed a response by August 3, 1984. On August 21, 1984, almost three (3) weeks after the expiration date, the Debtor wrote to S–J, accepting the proposed arrangement. This acceptance was conditioned upon the approval of Swig. Swig, for unspecified reasons, categorically refused to approve any flat fee arrangement, and accordingly that offer was terminated. Only now, after S–J has procured a 10–year lease and requested $450,000.00, has Swig inferred that the Court should impose the $100,000.00 fee upon S–J.

On July 25, 1984, S–J and representatives for the Debtor traveled to Phoenix, Arizona, Greycas' headquarters, to discuss possible leasing of this aircraft to America West Airlines ("America West"). This joint trip was the result of several meetings among the Debtor, S–J, and Greycas, during which time the possibilities of various leases and lessees were discussed. Greycas' proposal to lease the aircraft to America West was contingent upon Greycas obtaining possession of the aircraft, which possession it did not have, and could not have, pursuant to final court order.

With a general understanding as to professional fees but no finalized written agreement between them, the Debtor requested that S–J proceed with attempts to remarket the aircraft. At that time the aircraft was not airworthy, in that one of its engines had been removed and was placed, disassembled, in a box. Since the aircraft was not airworthy, it was providing no revenue to any of the parties. In September of 1984, Greycas made a proposal to America West which called for a 6-month lease with a 10-year option. The monthly rental fee proposed was $85,000.00. Additionally, since the aircraft was missing an engine, Greycas proposed to have America West lease an engine and subtract the cost of the leased engine from the monthly rental payments. Again, this proposal was contingent upon Greycas' receipt of the aircraft which it did not and could not obtain.

By October 25, 1984, S–J had procured a Letter of Agreement with Aloha Airlines ("Aloha"). The Agreement called for a 10-year lease at a monthly rental of $90,000.00. Further, Aloha, a more solvent and stable airline, agreed to supply the necessary second engine, without receiving a rent rebate thereon, and also agreed to return the aircraft at the conclusion of the 10-year lease with two operational engines instead of one.

On November 29, 1984, the Debtor and Aloha prepared a lease based on the agreement procured by S–J. The following day, an Order was entered in this Court approving this lease, finding it to be in the best interests of the estate. At that hearing the parties made the Court aware that the Debtor had requested S–J to procure a lease, that S–J had procured same, and that Greycas, while nominally objecting to S–J's involvement, wanted the lease, secured by S–J, to be approved. The rental proceeds were to be, and have been, deposited in an interest-bearing account pending disposition of this matter.

## LEGAL ARGUMENTS

Greycas, the Debtor, and S–J each make several arguments either for or against the allowance of compensation to S–J. Each party's arguments will be outlined seriatum.

### Greycas' Arguments

Greycas offers several arguments for disallowing any compensation whatsoever to S–J.

Pursuant to the May, 1983 Settlement Agreement Greycas avers that:

1. The contract was not executory at the time of the Debtor's filing and it could not be assumed.

2. Even if the contract was executory, the time for assumption of such a contract had passed.

3. The contract cannot be revived by the court.

4. The exclusive right to remarket the aircraft had expired.

5. Compensation under the contract rate cannot be allowed because S–J did not comply with the provisions requiring consent of Swig and Greycas.

Greycas claims that the Debtor and S–J attempted to obtain Greycas' consent on two separate occasions and failed.

Next, Greycas argues that no court approval of S–J's retention was either sought or obtained, as required by 11 U.S.C. § 327(a), and that absent such court approval, S–J is not entitled to any compensation.

Additionally, Greycas argues that the court should not approve S–J's retention nunc pro tunc because: S–J has not provided detailed records for the court to determine the amount of work done; it is not disinterested, as it holds an interest adverse to the estate, thereby precluding its appointment; and, nunc pro tunc orders appointing professional persons should not be permitted.

Greycas also argues that S–J cannot recover as a regular, salaried employee pursuant to 11 U.S.C. § 327(b) because:

1. S–J was an independent contractor, paid on commission as opposed to a salary.

2. The 10-year lease agreement with Aloha does not constitute work done in the ordinary course of business, as anticipated by the Code.

3. The lease required court approval, which would not be necessary if section 327(b) applied.

Finally, Greycas argues that since it is secured in the funds which S–J wishes to obtain, S–J must meet certain requirements to attach those funds, and S–J has not done so.

Specifically, S–J has not shown:

1. Its costs and expenses were reasonable and necessary.

2. Its costs and expenses were encountered in the preservation of the estate.

3. It provided a benefit to the estate which Greycas could not have provided without additional costs to the estate.

### Debtor's Arguments

The Debtor raises many of the same arguments that Greycas raises. The Debtor first states that S–J did not have prior court approval for its employment, thereby barring any compensation. Additionally, the Debtor argues that S–J cannot be approved nunc pro tunc as no extraordinary circumstances exist requiring the Court to equitably permit such approval and, as S–J is not disinterested, it could not have been approved even if the application had been timely submitted.

The Debtor also raises the argument that the May, 1983 agreement is not executory and cannot be assumed. The Debtor's final argument is novel, in that it avers that S–J has benefited the estate, and equitably, should receive some compensation. However, the Debtor argues that if S–J is granted the full amount it seeks, any hope for a Plan of reorganization will fail. The Debtor contends that all of the other parties have agreed to reductions in the amounts due them in order to put forward a reorganization Plan, and that S–J should be satisfied to do the same. It should be recognized that the various counsel have submitted fee applications, also to be paid from the rent accruals. It is interesting to note that there would have been no estate for these attorneys to divide if S–J had not procured the lease. It would appear to be grossly inequitable to pay the litigators more than the creator.

### S–J's Arguments

S–J initially asserts that no Court order is required before it can be compensated, because S–J carried out its activities in the

ordinary course of the Debtor's business, operating in a marketing capacity. Alternatively, S–J argues that if approval is necessary, it should be granted nunc pro tunc, in that:

1. That the Debtor assured S–J it would be compensated, but that formal Court approval was not obtained due to an admitted oversight on the part of the Debtor.
2. But for S–J's services, there would be no estate to administer and no company to reorganize.
3. Its assistance in obtaining the lease was allowed, if not formally accepted, by all parties now objecting.
4. That the Court can exercise its equitable powers to approve the employment nunc pro tunc in extraordinary circumstances, such as are present here.

Further, S–J states that it is a disinterested party, and could have been approved if the application had been presented by the Debtor in a timely fashion.

## ANALYSIS

■ Upon a careful reading of the May, 1983 Settlement Agreement, it is clear that it had expired by its own terms prior to the filing of the Debtor's petition. As such, it is not executory, and affords no rights to S–J under 11 U.S.C. § 365. It does, however, show the prior course of performance between the parties, including methods, mode and amounts of compensation, and will be recognized in that fashion by this Court.

We next address the issue of required Court approval prior to the compensation of professional persons employed to assist the bankruptcy estate. Bankruptcy Code § 327(a) and Bankruptcy Rule 2014 specifically outline the law and procedures surrounding the employment of professional persons. Section 327(a) states in pertinent part:

"[E]xcept as otherwise provided in this section, the trustee, with the Court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."

Pursuant to § 1107 of the Code, the term "debtor-in-possession" is interchangeable with the term "trustee", pursuant to § 327. Bankruptcy Rule 2014(a) states in pertinent part:

"[A]n order approving appointment of attorneys, accountants, appraisers, auctioneers, agents, or other professional persons pursuant to § 327 or § 1103 of the Code shall be made only on application of the trustee or committee, stating the specific facts showing the necessity for the employment, the name of the person to be employed, the reason for his selection, the professional services to be rendered, any proposed arrangement for compensation, and to the best of the applicant's knowledge, all of the person's connections with the debtors, creditors, or any other party in interest, their respective attorneys and accountants."

Many courts have held that court authorization prior to the services being rendered is the one absolute basic condition precedent to any fee application. *See In re Hydrocarbon Chemicals, Inc.,* 411 F.2d 203 (3rd Cir.1969); *In re Calpa Products Company,* 411 F.2d 1373 (3rd Cir.1969); *In re Garland Corporation,* 8 B.R. 826 (Bktcy.D.Mass.1981); *In re Fountain Bay Mining Company, Inc.,* 46 B.R. 122 (Bktcy.W.D.Va.1985).

This rule has been enforced not only as to attorneys but also as to non-legal professionals. *See In re Mork,* 19 B.R. 947 (Bktcy.D.Minn.1982); *In re Morton Shoe Company,* 22 B.R. 449 (Bktcy.D.Mass. 1982); *In re Sapolin Paints, Inc.,* 38 B.R. 807 (Bktcy.E.D.N.Y.1984).

This rule has often been held to be hard and fast despite the fact that the services rendered may have been highly valuable to the estate and performed in complete good faith. *See In re Garland Corporation,*

*supra,* at 828; *In re Morton Shoe Company, supra,* at 450; *In re Sapolin Paints, Inc., supra,* at 817.

Both the Debtor and Greycas argue to this Court that this inflexible per se rule as to court-approved employment is the law in the Third Circuit, and that therefore, S–J is not entitled to any compensation for services performed, as court approval was not obtained prior to the performance of the services.

S–J, on the other hand, argues that this Court, as a court of equity, should not hold fast to such an inflexible per se rule in extraordinary cases, urging this Court to approve the employment nunc pro tunc.

 It is true that a bankruptcy court exercises powers of a court of equity and equitable principles should govern the exercise of its jurisdiction. While such nunc pro tunc orders were originally frowned upon, many courts in recent years have allowed entry of nunc pro tunc orders on a case-by-case determination. Interestingly, the majority of the courts which have denied nunc pro tunc orders of employment have done so due to some other form of misconduct on the part of the applicant, which would have barred that individual's appointment even had the approval been requested in a timely fashion.

In *In re Mork, supra,* the court denied nunc pro tunc authorization of the services rendered by an accounting firm stating:

"[I] conclude that as here, not only absent an order, but absent any communication with the court whether or not resulting in an order, sufficient to appraise the court as to the intended retention and its necessity in terms, the court is without power to undue what has been done." 19 B.R. at 949.

In the case at bar, however, it is clear that the court was aware from early in these proceedings, that S–J was involved in the releasing and remarketing of the aircraft. It is also clear that the present day objectors had previously been aware of the Applicant's activities and in addition, had voiced their great appreciation for his services. Had the Debtor honored its agreement and presented the Applicant's employment application, this Court is hard pressed to think of any reason why it would not have been granted.

In *In re Morton Shoe Company, supra,* the court disallowed nunc pro tunc approval for a financial expert and for accountants because the court determined that no emergency existed warranting such approval. In *Morton,* unlike here, the court found that "hardship to the unauthorized professional is of no consequence since it is *of his own making."* 22 B.R. at 450. That court seemed to believe that hardship, if not of the professional's own making, would be an extraordinary situation which would allow nunc pro tunc approval.

Testimony before this Court has shown that S–J had in fact requested several times that it be given some assurance that its services would be permitted by the court. Testimony also indicated that S–J was assured by the Debtor's officers that the appropriate measures would be taken to assure that S–J would be acknowledged by this Court. Further, the Debtor's president testified that no application was made to this Court through an *oversight on the part of the Debtor.*

It should be noted also, that the Bankruptcy Code and Rules suggest that the application for appointment of such professional persons should be made by the trustee or the debtor-in-possession and that S–J is neither. Further, S–J as a leasing agent does not hold itself out to be knowledgeable in the area of bankruptcy law. There is no indication that Mr. Simon or anyone else involved with S–J Corporation is an attorney and therefore, S–J cannot be held to be charged with the knowledge of this requirement.

Both the Debtor and Greycas direct the court's attention to *In re Lewis,* 30 B.R. 404 (Bktcy.E.D.Pa.1983), in which the court did not permit the nunc pro tunc approval of the hiring of an attorney for the debtor. In that case, the court found:

"[T]o permit ex post facto employment would exalt form over substance to an

unreasonable extent. The court also notes that both Mr. Schildhorn and the members of his firm are experienced practitioners in this field of law. We are not confronted with an attorney who through inexperience has failed to file the necessary application, but rather, with an attorney who should be fully aware of this requirement." 30 B.R. at 405–6.

Again, the court seems to indicate that if the circumstances surrounding the absent approval were different, a nunc pro tunc application might be granted.

A very recent case in the Third Circuit that appears to be factually similar to our case, is *Matter of Freehold Music Center, Inc.*, 49 B.R. 293 (Bktcy.D.N.J.1985). In that case, accountants hired for the debtor specifically requested protection before commencing any work and were advised by the attorneys for the debtor that the appropriate application would be prepared and submitted to the court. The accountants were therefore aware that court approval was necessary before they could be paid, but in good faith relied on the statements of the attorney that authorization for their work had been obtained or had been properly arranged.

The court stated:

"[T]he position of the accountants in the instant case is further made sympathetic by the fact that the error, if indeed there was one, was occasioned not by their own actions, but rather by the action of another whose failure was beyond their own control." 49 B.R. at 296.

In *In re Century Foods, Inc.*, 39 B.R. 602 (Bktcy.M.D.Pa.1984), a real estate broker who performed services for the estate received nunc pro tunc approval after the broker's work was completed.

There, the court stated:

"[A]lthough we realize that nunc pro tunc orders should be authorized sparingly, this Court certainly has the discretion to administer equitable principles by entering such orders." 39 B.R. at 604.

It is clear therefore, that the inflexible nature of the per se rule once enunciated is presently being worn away by the equitable principles of the Bankruptcy Law on a case-by-case determination.

■ If however, a nunc pro tunc order for approval of appointment for the employment of a professional person is to be allowed, the party whose approval is sought must show that had the application been timely, the party would still have met the other requirements for employment as a professional person pursuant to § 327. Both the Debtor and Greycas argue that S–J does not meet the other requirements of § 327.

■ Specifically, they claim that in order for S–J to be qualified under § 327(a), it must meet two (2) requirements:

1. It must not hold or represent an interest adverse to the estate.
2. It must be a disinterested person within the meaning of the Code.

To hold an interest adverse to the estate means: "(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or, (2) to possess a predisposition under circumstances that render such a bias against the estate." *In re Roberts*, 46 B.R. 815, 827 (Bktcy.D.Utah 1985).

To hold that fees for services rendered to the debtor constitute an interest adverse to the estate is a position without logic. If such a statement were held to be true, then the attorneys representing the debtors who are presenting petitions for fees would also be held to have interests adverse to the estate, and therefore, would also be disqualified from compensation under § 327.

Further, it has previously been held that an attorney who is a major creditor of the debtor due to his prior representation of the debtor and due to his preparation of the petition in bankruptcy, does not, without more, have an interest adverse to the debtor. See *In re Heatron*, 5 B.R. 703 (Bktcy. W.D.Mo.1980).

The Debtor and Greycas also claim that S–J is not a disinterested person pursuant to the Bankruptcy Code. They base this claim on the fact that S–J has been listed by the Debtor as having a contingent disputed claim to funds resulting from their exclusive remarketing right under the Settlement Agreement of May, 1983.

This Court has earlier found that the May, 1983 Settlement Agreement expired by its own terms and is therefore no longer binding on any of the parties. Therefore, it was no longer binding on the parties at the time this bankruptcy petition was filed. Since S–J's exclusive remarketing right had expired prior to the filing of the bankruptcy, this Court can find no other cause for listing S–J as a creditor of the Debtor corporation.

■ As the court finds no reason to hold that S–J has an adverse interest to the Debtor, nor can the court find any reason to find that S–J lacks the required disinterestedness, the Court believes that there are no obstacles barring its equitable approval of the employment of S–J nunc pro tunc.

■ There still remains to be considered however, the reasonableness of the $450,-000.00 fee requested by S–J Corporation for its services to the Debtor's estate. There are many standards which exist for determining reasonableness of fees requested.

Some of these factors include:
1. The commercial reasonableness of the fee in light of what the market would pay for such a transaction outside the Bankruptcy Court.
2. The funds available in the Debtor's estate to pay such a fee.
3. The amount brought into the estate by the Applicant.
4. The difficulty of the services rendered by the Applicant.

At the hearing of January 21, 1986, testimony was taken from Mr. Thomas Hiniker, who is employed in much the same capacity as Mr. Simon and S–J Corporation, in that he has leased aircraft similar to the one in question. Mr. Hiniker testified that a rea-sonable fee in the aircraft leasing industry, when based upon a percentage of the rentals received, would be from five to ten percent of the total rentals received, and that fees might be higher when a transaction is exceptionally difficult. The fee charged and requested by S–J is less than five percent of the total rentals received over the 10-year lease period, which is below the bottom of the scale delineated by Mr. Hiniker.

The lease was approved and ordered on November 30, 1984. Sixteen (16) months have elapsed since that lease was ordered. The rental fee of $90,000.00 per month was ordered to be placed in an interest-bearing account. The total rental payments which should be in said interest-bearing account as of March 31, 1986, is $1,440,000.00, irrespective of interest accrued thereon. It is clear therefore, that the funds do exist for the payment of $450,000.00 to be made to S–J. Further, it must be realized that the total amount brought into the estate by this lease, which is $10,800,000.00 over the course of the 10-year lease, is the sole asset of the Debtor's estate. Were it not for the efforts of S–J in obtaining this lease, there would be no estate with which a reorganization could be effected. Additionally, it should be recognized that the aircraft in question was not in airworthy condition at the time the lease was procured. The leasing of an aircraft with only one of two engines must be considered a difficult deal to arrange. Given the fact that S–J was able to convince Aloha, a highly reputable airline, to lease said aircraft and also to supply the additional, necessary engine without any rental rebate, shows this Court that S–J possesses a high level of skill and expertise in this field. It is further clear that it would be highly difficult to lease such an unairworthy aircraft to most other airlines, given the fact that America West was to be given a credit on each monthly rental payment in order to supply an engine for use on the plane, and that no engine would be returning with the aircraft at the end of the 10-year lease. If this were not enough, S–J was able to get Alo-

ha to commit to a full 10-year lease term with knowledge that the plane was not airworthy. America West, on the other hand, was offered only a 6-month lease with a 10-year option. This gives the court reason to believe that America West was unwilling to make such a long-term commitment until it had the opportunity to use the aircraft, and determine if the aircraft would meet its needs.

Therefore, this Court is of the opinion that the fee requested by S–J of $450,-000.00 is reasonable and should be granted.

The final argument presented by Greycas is that the expenses requested by S–J should not be paid from funds belonging to it as a secured creditor. Specifically, Greycas contends that it received no benefit from the efforts by S–J and therefore, its security should not be impinged by the fees and expenses.

The Code discusses the appropriateness of such a charge in § 506(c) which states:

"[T]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

The Advisory Notes accompanying § 506(c) state in pertinent part:

"*Any* time the trustee or debtor-in-possession expends money to provide for the reasonable and necessary costs and expenses of preserving.... a secured creditor's collateral, the trustee or debtor-in-possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such a party." (Emphasis added.) 124 Cong.Rec. H11089 (Sept. 28, 1978), *reprinted* in 1978 U.S.Code Cong. & Ad.News 6436, 6451 (statement by Rep. Edwards); 124 Cong.Rec. S17406, *reprinted* in 1978 U.S.Code Cong. & Ad. News 6505, 6520 (statement by Sen. De-Concini).

Traditionally, expenses for the administration of the bankruptcy have not been charged against a secured creditor. The reason for this is that a trustee is acting not only on the secured creditor's interest, but for the interest of the general creditors as well.

■ An exception to that general rule is recognized when the expenses incurred in preserving the estate are primarily used to benefit the secured creditor or where that secured creditor caused or consented to the expense incurred. *See Matter of Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir.1983). Further, the courts have held that the secured creditor must be the party to bear the expense of the administration of the bankruptcy estate when it is solely for his benefit or he causes the expense incurred. *See In re Hotel Associates, Inc.*, 6 B.R. 108, 110 (Bktcy.E.D.Pa.1980). The court in *In re Hotel Associates, Inc., supra,* held that:

"[C]ases under the former Bankruptcy Act stress the importance of the secured creditor's consent to a charge upon the secured assets. Early decisions of the Court of Appeals for the Third Circuit held that a secured creditor could be charged with the costs of administration to which he consented, *expressly* or *impliedly,* or which he caused.... consent was often inferred from the circumstances or from *acquiescence,* especially where there were no free assets for administrative expenses." (Emphasis added.) 6 B.R. at 111.

The test for determining whether the funds of the secured creditor may be attached in order to be pay administrative expenses of the estate is as follows:

1. Are the costs and expenses reasonable and necessary?
2. Are the costs and expenses incurred for the purposes of preserving or disposing of the secured property?
3. Have the costs and expenses benefited the holder of the secured claim?

*See In re AFCO Enterprises, Inc.*, 35 B.R. 512, 514 (Bktcy.D.Utah 1983).

■ We believe that S–J has met this burden. S–J procured a 10-year lease with Aloha, a long standing and reputable airline, which agreed to rental payments of

$90,000.00 per month for a full 10-year term, in addition to furnishing the aircraft with the necessary second engine at its own expense. Aloha further agreed to return the aircraft at the end of the 10-year lease period with engines at half-life.

The contingent offer Greycas made to America West, on the other hand, was not nearly so lucrative. First, the proposition Greycas made to America West could not be consummated unless Greycas obtained possession of the aircraft. As has been stated earlier in this Opinion, Greycas at no time has been given possession of the aircraft; to the contrary, had been permanently enjoined from realizing such possession. Therefore, the deal that Greycas proposed to America West could never come to fruition.

Even if it had come into being, the unaccepted terms offered were not nearly so lucrative.

First, the lease to America West was to be for a 6-month term with a 10-year option. Conceivably, the lease could have been terminated at the end of six months, and the Debtor's estate would be in no better position than if the lease had never been entered.

Also, the lease called for a rental payment of $85,000.00 per month as opposed to the rental payment procured by S–J at $90,-000.00 per month. Over the course of the 10-year lease, this amounts to a difference of $600,000.00.

Furthermore, America West was to be given a rental rebate each month in order that it might proceed to lease a second engine for use on this aircraft. Said rebate would amount to approximately $6,000.00 per month over the course of the 10-year period, or an additional difference of $720,-000.00. This leased engine would not be returned with the aircraft at the end of the 10-year lease. As Aloha had agreed to return the aircraft with the engine at the end of the 10-year period, this involves an additional $600,000.00 increase to the value of the S–J lease agreement.

It appears to this Court that if Greycas had been able to achieve an agreement based upon the proposal it made to America West, that the proposal by S–J would still have benefited the estate by an amount of almost $2,000,000.00 more than that proposal made by Greycas. However, we cannot lose sight of the fact that the proposal made by Greycas was contingent upon Greycas obtaining equity in the aircraft from which it was permanently enjoined. Since that is the case, the $2,000,-000.00 figure is irrelevant; we must instead look to the full value of the lease procured by S–J.

This Court believes therefore, that the lease procured by S–J and the costs and expenses incurred thereby were necessary, did preserve the secured property and did operate to benefit the holder of the secured claim. Given this determination, we hold that S–J is entitled to the full compensation requested of $450,000.00 by Order nunc pro tunc.

An appropriate Order will be issued.