**In re FOUR STAR TERMINALS, INC., formerly Lamb Services, Inc., Debtor.**

**Bankruptcy No. 3-83-00054.**

United States Bankruptcy Court, D. Alaska.

Aug. 6, 1984.

**424**

Julian C. Rice and Kenneth P. Ringstad of Rice, Hoppner, Brown & Brunner, Fairbanks, Alaska, for debtor.

Charles D. Silvey, Jr., of Schaible, Staley, DeLisio & Cook, Inc., Fairbanks, Alaska, for Willner's Fuel Distributors, Inc.

## OPINION

J. DOUGLAS WILLIAMS, II, Bankruptcy Judge.

This matter is before the Court on the first and second interim applications for fees and expenses filed by Rice, Hoppner, Brown & Brunner ("Rice, Hoppner"), attorneys for the debtor-in-possession. The first interim application was objected to by an unsecured creditor, Willner's Fuel Distributors, Inc. ("Willner") on the basis that the hourly rates being charged by Rice, Hoppner are unreasonable and that Rice, Hoppner is entitled to pre-petition fees only for preparing and filing the petition, and for preparing the schedules and statements. The second interim application for fees and expenses was filed while the first application was under advisement. Willner then objected to Rice, Hoppner's request for fees for preparing and defending the first fee application and to the travel expenses incurred by one of the partners as being unnecessary. For the reasons set forth herein, the Court holds that: (1) Willner failed to rebut the showing made by Rice, Hoppner that its rates are reasonable for the Anchorage legal community; (2) Rice, Hoppner is entitled to recover for its pre-petition work as an administrative expense only for a reasonable amount of background research required to advise the debtor whether or not to file a petition, for a reasonable number of meetings to advise the client and to obtain the necessary information to draft the petition, statements and schedules, and for drafting the petition, statements and schedules; (3) Rice, Hoppner is not entitled to its fees for preparing and defending the first fee application; and (4) not all of the travel expenses incurred by Rice, Hoppner were reasonable and necessary, and those trips which were not reasonable and necessary are not to be reimbursed as an administrative expense.

The Court further holds that a new policy will be applied to interim fee applications, and that based on the circumstances of each case, a minimum of 25% of the fees found to be reasonable will be held back, absent a showing of extenuating circum-

stances. When a final application for fees is made in a case, the Court will review the results of the case, the interim fee awards made and the amounts actually paid to the attorney, and will make a final determination as to the total fees to be paid. The fees held back from the interim awards may or may not be paid to the attorney as part of the final fee award. In addition, in Chapter 7 cases, no order awarding interim attorney's fees will be signed unless, endorsed on the bottom of the order, counsel certifies that the interim fees paid to date, including those fees for which the order is being sought, do not exceed 25% of the assets liquidated to date, exclusive of cash paid to secured creditors or assumptions of secured indebtedness. In Chapter 11 cases, the order must contain a certification by counsel that the interim fees paid to date, including those fees for which the order is being sought, do not exceed the greater of 10% of the debtor-in-possession's annual net income as reported in the latest filed income tax return or 10% of the value of the debtor's assets as set out in the latest filed schedules and/or monthly reports. Absent a showing of extenuating circumstances by the attorney seeking fees, no award of interim fees above these limitations will be made. Any fees which are not awarded pursuant to these limitations may be applied for in the final fee application.

## FACTS

The debtor, a trucking company located in Anchorage, filed a Chapter 11 petition on April 5, 1983. Rice, Hoppner, which has been corporate counsel for the debtor since approximately January of 1978, filed its application to act as counsel for Four Star as debtor-in-possession on April 5, 1983, and its application was approved. Rice, Hoppner is located in Fairbanks, which is approximately 260 air miles from Anchorage. Rice, Hoppner does a substantial amount of bankruptcy work, and Julian Rice, one of the firm's senior partners who has been representing the debtor, specializes in transportation law.

Rice, Hoppner filed its first interim application for attorney's fees on August 25, 1983, requesting fees for services rendered from October 6, 1982, approximately six months before the petition was filed, to July 31, 1983, in an amount of $47,663.00 for fees and $7,203.17 for expenses. The rates charged are $150.00 per hour for Julian Rice, $110.00 for Kenneth Ringstad, an associate, and $50.00 for a legal assistant. Of the fees requested, the amount of $20,943.00 is for pre-petition services. As noted earlier, Willner objected to the hourly rates as being unreasonable and contended that competent counsel could have been found in Anchorage at a lower cost to the estate. Willner also objected to the large amount of pre-petition services on the basis that much of it was unreasonable and unnecessary.

A hearing was held at which Rice, Hoppner presented witnesses. Rodney Carman, an attorney with the Anchorage firm of Birch, Horton, Bittner, Pestinger & Anderson, testified that the rates being charged by Rice, Hoppner were comparable to those charged by Carman's firm. Carman testified that he did not find the application unreasonable. Carman had initially filed an objection on behalf of his client, but withdrew it after he had made a detailed review of the application.

Beverly Kelly, the president of the debtor and one of its shareholders and directors, testified that Rice, Hoppner has charged the same fees for its work both before and after the filing of the petition. She also said that several sessions were spent with Julian Rice going over a long list of questions as to the propriety of filing a Chapter 11, and that there was such a long pre-petition period for which Rice, Hoppner is seeking fees as an administrative expense because she had not wanted to file. Rice and the principals of the debtor spent over a year prior to the filing of the petition trying to put the company in a sound position without resorting to bankruptcy. As previously noted, the first interim application of Rice, Hoppner

includes fees for the six months prior to the filing of the Chapter 11 petition.

The operations manager of the debtor, John Orchard, testified that Rice, Hoppner had begun representing the debtor in 1978 or 1979, and the debtor had chosen Rice, Hoppner due to Rice's reputation in the area of transportation law. Orchard also testified that the most difficult problem prior to filing was convincing the principals to file, and that they constantly sought Rice, Hoppner's advice about filing.

Kenneth Ringstad and Julian Rice, the Rice, Hoppner attorneys who have been representing the debtor, also testified. Ringstad, an associate with Rice, Hoppner, testified that work on the bankruptcy proceeding began before the filing of the petition, and the application for fees included only the bankruptcy work being done for the debtor. He said he had been admitted to the Alaska Bar in 1980, and has not taken any courses in bankruptcy. Last year about half of his time was devoted to bankruptcy.

Julian Rice testified that the pre-petition time was incurred because he wanted to file the schedules and the statement of affairs with the petition. He also pointed out that it was necessary to do research and be ready to deal with two problems which he felt could ruin the debtor. The first of these problems was maintaining labor peace, as he felt the unions might go on strike and begin picketing after the petition was filed and the collective bargaining agreements were rejected. A settlement was eventually reached with the unions after the unions filed a Request for Assumption or Rejection of Executory Contract on April 27, 1983, approximately three weeks after the filing of the petition. The second problem involved maintaining the insurance coverage for the debtor, as the insurance company had given notice of cancellation. Rice did not expand on how filing the bankruptcy petition would worsen the situation with the insurance company. Rice also confirmed that the principals had been extremely hesitant to file bankruptcy and continuously had to be convinced that it should be done. After the decision to file, which was made on November 23, 1982, most of the time billed was spent in preparing the schedules and statement of affairs, according to Rice. He also testified that Rice, Hoppner was still doing other work for the debtor during the pre-petition period, and that although the bankruptcy and non-bankruptcy billings had been combined, Rice instructed the bookkeeper to separate out the bankruptcy items after he realized they were combined, and the fee applications reflect only the bankruptcy matters.

■■■ In the second interim fee application Rice, Hoppner seeks fees in the amount of $24,888.75 and costs of $4,415.49. Willner's objections to the second application are that Rice, Hoppner should not be entitled to fees for preparing and defending the first fee application, and that the trips made by Rice to Anchorage for which payment is sought in the second application are unreasonable and unnecessary expenses to the estate. According to the second fee application, Rice spent 20.5 hours in preparing and defending the first fee application, Ringstad spent 17.25 hours and a legal assistant spent 9 hours, for a total cost of $5,122.50.[1]

Between August 15, 1983 and December 27, 1983, Rice made 14 trips to Anchorage,

---

1. Rice, Hoppner's fee applications do not separately state each item and the time spent. For example, an entry for Rice in the second application dated November 30, 1983 provides:

Meet w/Rod Carmen, atty for Teamster Trust; negotiate claim & eliminate litigation; *review fee claim;* meet w/clients; L/D tele conf w/J.O. & Schraeder; return travel

(Emphasis added). The time billed for this block of services is 5 hours. Because the application does not provide a breakdown allocating an amount of time for each item alone, whenever an item related to preparing or defending the fee application appears in such a block, the entire amount of time given for the block is considered to be spent on the fee application as the Court has no way to determine the time spent for each item. *In re Horn & Hardart Baking Co.,* 30 B.R. 938, 944 (Bkrtcy.E.D.Pa. 1983).

Time records must be adequate to show the amount of time spent and the manner in which it was spent. *See* Bankruptcy Rule 2016(a), Local Bankruptcy Rule 23A. An entry of "research" or "telephone call" is insufficient. The

incurring expenses for air fare, taxi, meals, hotel room, auto, parking, telephone and one charge each for insurance and cleaning, which totaled $2,752.97. Not all of the expenses were billed in full to the debtor's account, but were often prorated with other clients for whom Rice also did business on the trips. The amounts billed to the debtor range from one-tenth of the expenses for one trip to the full amount of most expenses for several other trips. The average proration is one-half. The purposes of the trips, as evidenced by the fee application, include six trips to meet with the debtor and/or review the Court's file in Anchorage, five trips to meet and negotiate with such people as the head of the Special Procedures staff of the Internal Revenue Service and the attorney for the unions, one trip to meet with the debtor and to consult with an Anchorage attorney about acting as an expert witness in the hearing on the fee application, one trip for the hearing on a stipulation and the attorney's fee application, and one trip for which no time was billed. Rice always traveled the day before his meetings were scheduled, with the exception of one trip during which he spent one hour reviewing the Court's file.

## LAW

The award of attorney's fees in bankruptcy cases is a subject which draws emo-

---

Court should be able to determine from the time record entries, generally, whether the service was reasonable. *In re Art Shirt Ltd., Inc.,* 30 B.R. 318, 321 (Bkrtcy.E.D.Pa.1983); *In re Jones,* 13 B.R. 192, 193–194, 4 C.B.C.2d 1477 (Bkrtcy.E.D.Va.1981); *In re Hamilton Hardware Co., Inc.,* 11 B.R. 326, 330, 7 B.C.D. 963, 4 C.B.C.2d 699 (Bkrtcy.E.D.Mich.1981). *See also In re Continental Illinois Securities Litigation,* 572 F.Supp. 931 (N.D.Ill.1983).

The actual time spent on each item should be recorded and, except as noted below, small amounts of time should not be uniformly reported as a minimum block of time. For example, short telephone conversations should not routinely be recorded as .25 hours which would be 15 minutes. As the court notes in *In re Sapolin Paints, Inc.,* 38 B.R. 807, 11 B.C.D. 875, 879 (Bkrtcy.E.D.N.Y.1984), the telephone company's rates are predicated on an average phone call of three minutes. If phone calls are routinely recorded as 15 minutes, for example, at a rate of $110 or $150 per hour and the attorney makes a number of calls, the distortion in the hours claimed and the cost to the estate are substantial. It would not be objectionable to use one-tenth of an hour as the minimum charge for a telephone call.

Rice, Hoppner has also listed as an item of service to the estate the travel time incurred by Julian Rice in travelling between Fairbanks and Anchorage. Absent a showing by the attorney seeking reimbursement that local counsel could not be obtained to handle a case, in future applications travel time alone will not be considered a necessary service and will not be reimbursed. *See In re Arlan's Department Stores, Inc.,* 462 F.Supp. 1255, 1269 (S.D.N.Y.1978), *aff'd.* 615 F.2d 925; *In re Continental Illinois Securities Litigation,* 572 F.Supp. 931, 934 (N.D. Ill.1983).

Applicants for fees should also note that there are a number of items which will no longer be allowed as expenses by this Court, although they have not been claimed by Rice, Hoppner. The fee paid to an attorney is calculated to include overhead, including but not limited to secretarial and clerical services, the use of a word-processor and the fees paid to computer research services such as Westlaw or Lexis. These are not expenses which are reimbursable in addition to an award of attorney's fees. *In re Sapolin Paints, supra,* 11 B.C.D. at 880, 38 B.R. 807; *In re Arlan's Department Stores, Inc., supra.* As the court points out in *In re Horn & Hardart Baking Co., supra* at 942 "when the Court awards such generous hourly rates, it does so with the inference that clerical and support staff are to be compensated by the law firm and not the client." Accordingly, those law firms who bill for such items as secretarial time and file maintenance by paralegals may expect to find their hourly rates reduced to take into account the reduction in their out-of-pocket expenditures for overhead.

The cost of photocopying was disallowed as a reimbursable expense by the court in *In re Horn & Hardart Baking Co., supra* at 945. In light of the noticing requirements placed on attorneys by Bankruptcy Rule 2002 and Local Bankruptcy Rule 4E, the costs incurred with regard to both photocopying and postage can be substantial, depending on the number of creditors involved. The actual cost of photocopying, not to exceed 25¢ per page, and the cost of postage will be allowed as necessary expenses.

The disallowance of fees and expenses which do not meet the above standards will be made even if no interested party objects to the application. The Court has a duty to determine independently that the fees and expenses requested meet the requirements Congress has promulgated. *In re Liberal Market, Inc.,* 24 B.R. 653, 657, 9 B.C.D. 1216 (Bkrtcy.S.D.Ohio 1982).

tional responses from the bar, from the bench and from the scholastic community.[2] Despite the emotional atmosphere, however, attorneys practicing bankruptcy law, whether it be representing the debtor, a creditor or the trustee, need clear standards by which to either chart their own course of action if fees are to be considered by the court or by which to consider the fee applications filed by others. In the context of the fee applications filed by Rice, Hoppner and the objections raised by Willner, the Court will provide some guidance on the issues raised by explaining how and why the resolution of these issues was made.

Section 329 of the Bankruptcy Code[3] ("Code") provides with regard to the debtor's attorney that:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of and in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the *reasonable* value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive. . . .

(Emphasis added.) Section 330 of the Code contains the standard for compensation of officers and professional persons, which includes the attorney for the trustee or the debtor-in-possession upon the court's approval of the application for employment, and the attorney for the debtor. In pertinent part, § 330(a) provides that the court may award:

(1) *reasonable* compensation for *actual, necessary* services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any para-professional persons employed by such trustee, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for *actual, necessary* expenses.[4]

(Emphasis added.)

Under the Code, an attorney may seek compensation for his services before the completion of the case. Section 331 provides:

A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and dis-

**2.** A recent exchange of verbal shots between Judge Harold Lavien and Professor Richard Aaron is illustrative. *See* Aaron, *The Bankruptcy Bench,* 89 Com.L.J. 47 (January 1984) in which Professor Aaron likens the awarding of fees to the payment of tribute to Genghis Khan and Lavien, *Fees as Seen From the Bankruptcy Bench,* 89 Com.L.J. 136 (March 1984) in which Judge Lavien takes umbrage at the tone of Aaron's column.

**3.** 11 U.S.C. § 101 *et seq.* (1978).

**4.** Section 330(a) was amended by § 433 of the Bankruptcy Amendments and Federal Judgeship Act of 1984. The language of "time, the nature, the extent, and the value of such services" has been stricken, and in lieu thereof is substituted the "nature, the extent, and the value of such services, the time spent on such services." Although the amendment of § 330(a) becomes effective only as to cases filed 90 days after the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, the change in the language of § 330 would have no effect on the Court's opinion in the instant case as the change is merely a stylistic one. S.Rep. No. 98–65, 98th Cong., 1st Sess. 75 (1983).

burse to such applicant such compensation or reimbursement.

■ Sections 329, 330, and 331 apply in the instant case. Rice, Hoppner represented the debtor before the petition was filed and received from the debtor a $15,000.00 retainer in connection with the Chapter 11 filing, as disclosed in the statement filed by Rice, Hoppner on April 5, 1983. For the remainder of the pre-petition fees and for the fees incurred acting for the debtor-in-possession, Rice, Hoppner is seeking an interim award of fees from the Court pursuant to § 330 and § 331. In both § 329 and § 330, Congress has provided that the compensation be reasonable for the services performed. In addition, for compensation sought from the estate the services must be actual and necessary, as must any expenses for which reimbursement is sought. These are the basic standards by which Willner's objections must be resolved.

■ In considering Rice, Hoppner's applications and Willner's objections, it should be noted that the burden of proof as to the entitlement to and reasonableness of the fees sought rests on Rice, Hoppner as the moving party. *In re Crutcher Transfer Line, Inc.*, 20 B.R. 705 (Bkrtcy.W.D.Ky. 1982); and *In re Hamilton Hardware Co., Inc.*, 11 B.R. 326, 7 B.C.D. 963, 4 C.B.C.2d 699 (Bkrtcy.E.D.Mich.1981).

### REASONABLENESS OF RATES CHARGED BY RICE, HOPPNER

■ Compensation in bankruptcy cases, as noted above, is to be based upon reasonableness. Under the Bankruptcy Act of 1898, the courts applied the same factors as those detailed by Congress in § 330 of the Code, with the exception of the cost of comparable services in a non-bankruptcy matter. Instead of the latter, a spirit of economy was applied and the courts set limits to the fees which could be recovered in order to conserve the bankruptcy estate, even in those cases where the fees were requested by attorneys who had made substantial contributions to achieve a successful conclusion of the case. *See Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir.1980) (the creditors received a 100% dividend); and *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817 (9th Cir.1976, as amended 1977) (business was successfully reorganized). However, the legislative history of § 330 specifically shows that it overrules *Beverly Crest*, Congress reasoning that:

> If that case were allowed to stand, attorneys that could earn much higher incomes in other fields would leave the bankruptcy arena. Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service. Bankruptcy fees that are lower than fees in other areas of the legal profession may operate properly when the attorneys appearing in bankruptcy cases do so intermittently, because a low fee in a small segment of a practice can be absorbed by other work. Bankruptcy specialists, however, if required to accept fees in all of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 330 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6286; *Southwestern Media, Inc., v. Rau*, 708 F.2d 419, 427 n. 13 (9th Cir.1983). With the exception of the standard of economy, the criteria remain the same under the Code as they were under the Bankruptcy Act. *In re Sutherland*, 14 B.R. 55, 4 C.B.C.2d 1580 (Bkrtcy.Vt.1981). However, "economy in administration" is still a basic objective under the Code which means the services must be "actual" and "necessary". *In re Yermakov*, 718 F.2d 1465, 1470 (9th Cir.1983). Since the enactment of § 330, the range of rates charged by attorneys in Anchorage for bankruptcy

work has become fairly broad.[5] Although the rates requested by Rice, Hoppner are near the higher end of the scale, the evidence presented by Rice, Hoppner and unrebutted by Willner was that the rates requested are comparable to those charged by Anchorage firms, and are the same rates Rice, Hoppner charged the debtor for pre-petition non-bankruptcy work. Rice, Hoppner implies in its argument that because the spirit of economy prevalent under the Bankruptcy Act has been done away with and because Rice, Hoppner's rates are comparable, a sufficient showing of reasonableness has been made. The argument of debtor's counsel is not the analysis which Congress intended. In its report regarding § 330(a), the Senate addresses the issue of comparable compensation, and states:

> In a bankruptcy case fees are not a matter for private agreement. There is inherent a "public interest" that "must be considered in awarding fees". ... An allowance is the result of a balance struck between moderation in the interest of the estate and its security holders and the need to be "generous enough to encourage" lawyers and others to render the necessary and exacting services that bankruptcy cases often require. ... The

rates for similar kinds of services in private employment is one element, among others, in that balance. Compensation in private employment noted in subsection (a) is a point of reference, not a controlling determinant of what shall be allowed in bankruptcy cases.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 40 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5826. (Citations, footnote omitted). Although "the primary method used to determine a reasonable attorney fee in a bankruptcy case is to multiply the number of hours expended by an hourly rate" for comparable services, the court should also focus on other appropriate factors to determine the extent to which a particular fee application is to be allowed. *In re Yermakov, supra* at 1471.

Section 330, quoted above, provides that the services must first be actual and necessary. With the exception of the pre-petition services discussed below, Willner has not suggested nor can the Court find that the services rendered by Rice, Hoppner were not actual and necessary. Next, in determining if the hourly rate is reasonable, the time, nature, extent and value of these services must be considered.[6]

---

**5.** Although Rice, Hoppner is a Fairbanks law firm, the instant case has been filed in Anchorage. The determination of reasonableness is to be made with regard to the community, area or district in which the legal services are rendered. *In re Sutherland,* 14 B.R. 55, 58 4 C.B.C.2d 1580 (Bkrtcy.Vt.1981). *See also Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (reasonable fees in a Civil Rights case are to be calculated according to the prevailing market rates in the relevant community).

**6.** *In re Yermakov,* 718 F.2d 1465, 1471 (9th Cir.1983). A number of courts have applied the twelve factors detailed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974), an employment discrimination action, to bankruptcy matters. *See Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088, 1091–1092 (5th Cir.1980); and *In re Lloyd, Carr & Co.,* 2 B.R. 714, 716–718 (D.Mass.1979). Rice, Hoppner has argued in its memoranda in support of its fee application that the Johnson factors should be applied in the instant case. These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the

legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

The use of all twelve factors in bankruptcy cases has been criticized. In *In re Casco Bay Lines, Inc.,* 25 B.R. 747, 754, 9 B.C.D. 1301 (Bkrtcy.App.Panel 1st Cir.1982), the court rejected the Johnson analysis, stating that: "In the practical sense ... the delineation of twelve rubrics does little to assist in the trial court's determination of a reasonable fee allowance." (Footnote omitted). The Casco Bay court instead calculated the number of hours reasonably expended based on a reasonable hourly rate. The initial calculation can then be adjusted upward or downward, to take into consideration any factors which did not go into the initial calculation, but which the court determines

As detailed above, Rice, Hoppner presented testimony at the hearing as to the time and extent of its efforts in regard to the debtor, both pre- and post-petition. Negotiations were undertaken with the labor union, the major secured creditor and the Internal Revenue Service, and agreements favorable to the debtor's reorganization were reached with all of these parties. Rice, Hoppner's expertise in the areas of bankruptcy and transportation law facilitated the negotiations. The schedules and statement of affairs, although amended several times, were timely filed. As a regulated business, the debtor's reorganization is complex, but the nature of the issues is similar to those faced by any business of consequence which files a Chapter 11. Generally there are debts owed to the Internal Revenue Service, the major secured creditors are uneasy about repayment and diminution of their collateral, and many customers have doubts about continuing a business relationship with the debtor. Oftentimes there are difficulties with labor unions, as evidenced by the numerous decisions of the courts and the legislative battle recently resolved by Congress dealing with the rejection of labor union contracts.[7] It is also difficult to judge the value of Rice, Hoppner's services at this time. It appears that the case is proceeding toward the confirmation hearing on a plan of reorganization, but a basic test of a Chapter 11 proceeding is whether a plan is confirmed.

Rice, Hoppner suggested in its Memorandum on Attorney's Fees that the rates charged in the instant case are not only reasonable, but that it is entitled to a bonus. Based on the time, nature, extent and value of Rice, Hoppner's services as of this time and evidenced by the unrebutted testimony of Julian Rice, Kenneth Ringstad

---

should be included. The calculation takes into account the factors delineated by Congress—the time expended, the nature of the services rendered and the skill required to render those services, the novelty and difficulty of the questions presented and the opposition encountered. This approach has sometimes been called the "lodestar" method of determining attorney's fees.

In *In re Nor-Les Sales, Inc.*, 32 B.R. 900, 902 (Bkrtcy.E.D.Mich.1983), the court stated that the basic factors to be considered in evaluating a fee application are the time spent, the intricacy of the issues involved, the size of the estate, the opposition and the results obtained. Quoting from Johnson, the court noted that:

Courts have additionally considered other factors such as the "undesirability of the case," "the nature and length of the professional relationship with the client," "the preclusion of other employment by the attorney due to the acceptance of the case," "whether the fee is fixed or contingent," and "awards in similar cases". ... It is questionable whether these additional factors have any significant impact in the fee analyzation process.

(Citation omitted).

Willner has pointed out that applying all of the Johnson factors in the instant case would create an inconsistent calculation. For example, Rice, Hoppner argues that it is entitled to a higher hourly rate because of its expertise in the bankruptcy field, the ninth factor in Johnson. Rice, Hoppner then argues that it is also entitled to a higher rate because the tenth factor is the undesirability of the case, and bankruptcy cases are inherently undesirable. As Willner notes, it is handling bankruptcy cases such as that of the debtor which gives Rice, Hoppner the expertise which it claims entitles it to a higher hourly rate. To allow the rate to be raised even higher due to some perceived undesirability on Rice, Hoppner's part of the very type of cases which it is cultivating as a significant part of its practice is, at the least, contradictory and unreasonable.

The principal approach should be that used by the court in *Yermakov, supra*, and *In re Hamilton Hardware Co., Inc., supra* note 1, at 329 (Bkrtcy.E.D.Mich.1981), in which a reasonable hourly rate was determined by focusing on the factors Congress outlined in § 330. As indicated in *Yermakov*, reference may also be made to the factors considered in Johnson in order to determine if a fee is reasonable. *See also Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1939–1941, 76 L.Ed.2d 40 (1983) (a reasonable fee award in a Civil Rights case is based on the number of hours reasonably expended multiplied by a reasonable hourly rate, which will subsume many of the Johnson factors.)

7. *In National Labor Relations Board v. Bildisco and Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984), the Supreme Court held that a collective bargaining agreement can be rejected as an executory contract under § 365 if the debtor-in-possession can show that the agreement burdens the estate and the equities involved balance in favor of rejection. The Bankruptcy Amendments and Federal Judgeship Act of 1984 passed by Congress on June 29, 1984, and signed by President Reagan on July 10, 1984, contains a provision which modifies the *Bildisco* opinion to make rejection more difficult for a debtor.

and Rodney Carman, the rates charged by Rice, Hoppner meet the requirements of § 329 and § 330, but do not suffice for the award of a bonus in the form of a higher hourly rate.[8] *See Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 1547–1550, 79 L.Ed.2d 891 (1984).

## PRE-PETITION SERVICES FOR WHICH RICE, HOPPNER SEEKS RECOVERY AS AN ADMINISTRATIVE EXPENSE

As detailed earlier, Rice, Hoppner is seeking recovery for services rendered to the debtor up to six months prior to the filing of the petition as an administrative expense, amounting to almost $21,000.00. Rice, Hoppner justifies its application to recover these fees as an administrative priority claimant rather than as a general unsecured creditor on several grounds. First, as the principals of the debtor were reluctant to file a bankruptcy petition, they had to be convinced to do so and then had to be continually reassured that it was the correct decision. Second, Julian Rice believed that the labor unions might strike once the petition was filed and the union contract was rejected. Accordingly, a substantial amount of pre-petition time was spent researching the standard for rejection of a union contract in the Ninth Circuit and whether the bankruptcy court could enjoin picketing. Appropriate motions and memoranda were prepared before the petition was filed.

▮▮▮ Willner objected to the large amount of pre-petition fees requested by Rice, Hoppner as an administrative ex-

pense. As explained below, Rice, Hoppner will be allowed its pre-petition fees for:

1. a reasonable amount of background research concerning the potential debtor's financial condition to determine whether or not the client should be advised to file a petition;

2. a reasonable amount of meetings with the client to obtain the necessary information to draft the petition, statements and schedules; and

3. a reasonable amount of hours for drafting the petition, statements and schedules.

Because the services in question were rendered by Rice, Hoppner before the filing of the petition, they are services rendered to the debtor, as the debtor-in-possession does not come into existence until the petition is filed. Section 329(b), as quoted earlier, allows the court to examine the reasonableness of the compensation paid to the debtor's attorney for services rendered in contemplation of the filing of a bankruptcy petition. Section 330, also quoted earlier, provides that the attorney for the debtor may be paid reasonable compensation for *actual* and *necessary* services. As noted by the court in *In re Yermakov, supra* at 1472:

A proper construction of the bankruptcy fee statute allows compensation under the administrative expense provision of section 330 for only those "actual, necessary services" rendered by the debtor's attorney "in contemplation of and in connection with" the bankruptcy case. ... Reasonable fees charged for services rendered for other purposes may also be

---

**8.** Because § 330 requires an analysis of the rates charged in each case, the rates allowed in the instant case should not be construed to be transferable to other cases such that similar rates will always be allowed by the Court. Section 330 requires that the rates used for comparison should be in a *non*-bankruptcy matter. As the court notes in In re *G.W.C. Financial & Insurance Services, Inc.,* 8 B.R. 122, 126, 7 B.C.D. 109 (Bkrtcy.C.D.Ca.1981), a comparison with non-bankruptcy matters will not only protect bankruptcy attorneys against awards of inadequate fees, but will also put a damper on bankruptcy rates which are higher than compa-

rable non-bankruptcy rates. In *G.W.C.* a survey showed that generally the business non-bankruptcy firms in the area charged less than the bankruptcy firms.

Moreover, a case-by-case determination is necessary to determine if the services rendered were actual and necessary, and to consider the time, nature, extent and value of the services for which compensation is sought. A creditor who is willing to challenge a debtor's attorney on these points and to present rebuttal evidence to debtor's counsel's assertions in support of its fee application may be able to show that a fee near the high end of the scale is not reasonable.

compensated, but only as general claims against the estate, and not as compensation under section 330.

(Citation omitted).

In *In re Olen*, 15 B.R. 750, 8 B.C.D. 555, 5 C.B.C.2d 944 (Bkrtcy.E.D.Mich.1981), the court relied on § 329 and § 330 in limiting the compensation of the debtor's attorney for filing a Chapter 7 petition. The attorney claimed he was entitled to a fee higher than the range normally charged as he spent 20 hours researching whether the alimony awarded to the debtor's ex-wife was dischargeable and the effect of several sections of the Employees Retirement Income Security Act (ERISA). The debtor's former spouse filed a complaint with regard to the dischargeability issue, which was settled. The purpose of the ERISA research was never revealed and was not raised as an issue in the bankruptcy proceedings.

In rejecting the attorney's argument for a higher than normal fee, the *Olen* court stated that the attorney for a client who is contemplating bankruptcy should determine if there are facts which may be the basis for any discharge or dischargeability actions and should take those facts into consideration when making a decision to file or not. The court then continued:

> However, counsel is not required to perform in-depth research with respect to every conceivable action that may arise after the filing of the petition. Although grounds for creditor postpetition actions may exist, counsel cannot predict whether a creditor will actually institute any such action, nor can he accurately evaluate the work necessary to resolve it.

*Id.* at 753. The court disallowed attorney's fees for the 20 hours of research on the dischargeability and ERISA issues, although a complaint was filed by the ex-wife with regard to the dischargeability of her alimony award.

The court also stated that its decision was, in part, a precautionary measure:

> Any other approach would, in effect, be a signal to attorneys that they could charge whatever the traffic would bear with impunity. Limiting prepetition pay-

ment to services rendered or to be rendered in connection with the filing of the petition and attendance of the first meeting of creditors removes the temptation by an attorney to load his time sheets with time devoted to the resolution of postpetition problems that might conceivably arise but never materialize.

*Id.* at 753–754.

Rice, Hoppner has submitted that the *Olen* analysis is inapplicable to a Chapter 11 proceeding, since the emphasis in Chapter 11 is on the rehabilitation and not the liquidation of the debtor. Rice, Hoppner argues that a Chapter 11 debtor will be less likely to allow its attorney to charge exorbitant fees than a debtor in a Chapter 7 who anticipates that the debtor's estate will all go to the creditors anyway. It is Rice, Hoppner's position that the debtor in the instant case was faced with numerous and substantial problems which required work before the filing of the petition so Rice, Hoppner could immediately deal with the problems as various creditors reacted to the bankruptcy. While this may be true, every Chapter 11 debtor is faced with the problems of creditors and cash flow which forced it into filing a petition, and the attorneys in every case must be ready to react to the actions taken by affected parties. The Court fails to see how the instant case is atypical so as to require a special rule.

In analyzing a fee application from counsel for a debtor-in-possession, the court in *In re Hamilton Hardward Co., Inc., supra* at 330, discussed the position of the debtor-in-possession with regard to his attorney's fees:

> With the aid of his attorney, he is able to submit a plan which creditors accept and which is confirmed by the court. Not only is the debtor in no position to make an objective judgment as to the value of the legal services involved, but he also has no inclination to object to whatever fee is requested by the attorney who has made it possible for him to continue in business.

It was further noted by the court that:

> Confirmation of a Chapter 11 case is merely a step in the rehabilitation pro-

cess. The fact that a plan has been confirmed does not offer any assurance that the debtor will ultimately be successful. The opportunity given to a debtor by Chapter 11 to work out his financial problems should not be jeopardized by requiring him to pay excessive costs of administration. ... Courts "must ever be alert lest a reorganization inure to the benefit, not of the distressed debtor and the creditors but only to those engaged in saving it". *Pennish v. Herz,* 81 F.2d 511, 512 (7th Cir.1936).

*Id.* at 333 (Footnote, citation omitted).

 A Chapter 11 debtor is in need of its funds to effectuate its reorganization and should not be subjected to undue administrative expenses in the form of attorney's fees, particularly if the fees are generated by time spent researching and preparing for issues which may not arise. Such is particularly true where the time is spent pre-petition, and a number of events could intervene to make the time and effort wasted. For example, the debtor's pre-petition attorney may not be qualified to be appointed as attorney for the debtor-in-possession, and the attorney eventually authorized would have to re-do much of whatever pre-petition work actually became necessary. Some attorneys who represent clients contemplating bankruptcy may be inclined to describe the hours spent working on matters which would ordinarily be non-bankruptcy matters on their time records in such a way that if the client does choose to file a petition, recovery for the non-bankruptcy work can be sought as an administrative expense on the theory that it was directed toward some potential problem in the reorganization. Unfortunately,

there will also be those few attorneys who will load their time sheets with research and effort directed to possible actions which have an almost non-existent chance of occurring. While the Court is not implying that Rice, Hoppner's actions in the instant case were undertaken in bad faith or for selfish motives, as a matter of policy the pre-petition fees of the debtor's attorney should be limited to advising the client whether to file and to preparing the petition and the accompanying documents, absent a clear showing of exceptional circumstances.[9] Accordingly, the time spent by Rice, Hoppner in researching the status of rejection of labor contracts and injunctions to halt picketing will not be allowed as an administrative expense, as it was not actual and necessary to the filing of the petition and therefore is not reasonable.[10]

 In their testimony, debtor's principals and Julian Rice, as noted above, also indicated that a considerable amount of time was spent reassuring the principals that filing a Chapter 11 was the correct action to take. For example, the fee application indicated that Julian Rice spent 28 hours in meetings and telephone conferences with the debtor up to and including the meeting in which it was decided to file a petition. These meetings occurred over a period of time from October 6, 1982, to November 23, 1982.[11] After the decision to file was made, Rice billed an additional 62.75 hours attributable to meetings with the client before the petition was actually filed. Taking into consideration Rice's past representation of the debtor and the testimony of Beverly Kelly, the debtor's president, that Rice and the principals had spent

9. Although the hours objected to in the instant case with regard to the first fee application are all pre-petition, services rendered post-petition must also be necessary and actual in order to meet the requirements of § 330. As the court noted in *In re Nor-Les Sales, Inc., supra* note 6, at 903 "an attorney is not entitled to compensation for time spent in discussing abstract legal questions. An estate cannot be compelled to pay for counsel's private educational seminars."

10. Pre-petition fees which are not allowed as an administrative expense may be allowed as an

unsecured claim. *In re Yermakov,* 718 F.2d 1465, 1472 (9th Cir.1983).

11. As previously discussed in footnote 1, the time record submitted by Rice, Hoppner frequently lists a number of items together on one day with a single amount of time listed for all the items. Where the time record contains an item for which fees are not allowed, the entire amount of time billed has been attributed to that item.

over a year prior to the filing of the petition trying to put the company back into a sound financial condition, the total amount of 90.75 hours attributable to client meetings at a cost of $13,612.50 is not reasonable. Rice was already familiar with the debtor's economic status, and much of the time spent reassuring the vacillating principals of the debtor is in the nature of a business matter which did not contribute to actually eliciting the necessary information for preparing the petition, statements and schedules.

Accordingly, Rice, Hoppner will be allowed the following for their pre-petition services:

| Julian Rice | | Hours |
|---|---|---|
| 11/23/82 | Meeting at which decision to file was made | 8.00 |
| 3/29/83 | Meeting with clients, review work | 8.00 |
| 3/30/83 | Prepare for filing petition | 10.00 |
| 4/04/83 | Review documents, meeting with clients | 6.00 |
| | | 32.00 |

32 hours at $150.00 = $4,800.00

| Kenneth Ringstad [12] | | Hours |
|---|---|---|
| 3/29/83 | Prepare schedules and statements | 1.25 |

1.25 hours at $110.00 = $137.50

| Legal Assistant [13] | | Hours |
|---|---|---|
| 10/08/82 | Conference with Rice re Chapter 11 paperwork | .50 |
| 10/10/82 | Review statement of affairs and schedules | 1.50 |
| 10/11/82 | Meet with client in Anchorage to complete statement and schedules | 7.00 |
| 10/26/82 | Complete information on statement | 1.00 |
| 10/27/82 | Review schedule B–4, payments to attorneys | .75 |
| 11/19/82 | Mailing matrix, schedule A–3 | 2.50 |
| 11/22/82 | Draft petition, statement of affairs | 1.00 |
| 11/30/82 | Draft application for attorney and accountant | .50 |
| 03/21/83 | Resolution and fee agreement | 1.00 |
| 03/30/83 | Tele Conf. w/Sandy at U.S. District Court re: filing Bankruptcy Petition in Fairbanks | .25 |
| 04/01/83 | Final revisions to documents | 6.00 |
| | | 22.00 |

22 hours at $50.00 = $1100.00

Total amount allowed: $6,037.50.

---

12. Most of Ringstad's time was spent in "research", which presumably was on the labor questions. Because of this and because "research" alone is an insufficient description of the service rendered, only one pre-petition entry for Ringstad on the time record has been allowed.

13. The entries for the legal assistant on March 29 and March 31, 1982 include preparing an Application for Authority to Operate Business by Debtor in Possession. Such an application is no longer necessary under the Code, as § 1108 permits the business to be operated unless the court orders otherwise. *In re FitzSimmons*, 725 F.2d 1208, 1210 (9th Cir.1984). Accordingly, the time billed for a legal assistant on these days has not been allowed.

Of the $20,943.00 requested for pre-petition services on the first application for attorney's fees, $14,905.50 is disallowed.

## FEES FOR PREPARING AND DEFENDING THE FIRST FEE APPLICATION

■ In its second fee application, Rice, Hoppner requested fees in the amount of $5,122.50 for preparing and defending its first fee application against Willner's objections. Willner has objected to the allowance of fees generated by the fee dispute. No fees will be allowed for preparation of the fee application. In addition, because the objections by Willner were not frivolous and Rice, Hoppner's fees on the first application were substantially reduced, Rice, Hoppner will also not be entitled to the fees incurred in defending its first application.

Section 330 allows for compensation to be paid to an attorney for services rendered, presumably to the estate, based on several considerations including the value of the services. Preparation of the fee application is not a service to the estate, and is of value only to Rice, Hoppner and not the debtor-in-possession and its creditors. As the court noted in *In re Liberal Market, Inc.*, 24 B.R. 653, 661, 9 B.C.D. 1216 (Bkrtcy.S.D.Ohio 1982):

[M]atters regarding the computation of an attorney fee is not a "service rendered" on behalf of a debtor, but is instead an expense of doing business which

should not be chargeable to a debtor's estate. 11 U.S.C. § 330(a)(1).

The court in *In re Hotel Associates, Inc.*, 28 B.R. 332, 334 (Bkrtcy.E.D.Pa.1983), stated that counsel must prepare the fee application in order to be paid, but in preparing the application, the attorney is protecting personal interests and is not performing a service of which the estate is the beneficiary.[14]

Rice, Hoppner also requested fees in the second fee application for defending the first fee application. As detailed above, Willner objected to the amount of pre-petition fees requested in the first fee application and the Court agrees and is reducing the amount of pre-petition fees allowed. Willner's objection was not frivolous. In *In re Erewhon, Inc.*, 21 B.R. 79, 89, 9 B.C.D. 288 (Bkrtcy.D.Mass.1982), the court addressed the issue of whether an attorney representing a secured creditor who is seeking fees from the estate should be allowed compensation for defending a fee application which was found to be excessive. As the *Erewhon* court noted, the focus should be on the burden placed on the estate:

Should the estate, and every bankrupt estate is assumed to be financially troubled by definition, be placed under the duress of added costs for trying, in good faith, to ensure that the charges against it are reasonable? The [creditor's] attorney is protected against unreasonable challenges because counsel for the estate will always have to justify the reasonableness of his challenge when his own

---

**14.** A similar rationale has been applied in non-bankruptcy class action suits, in which the efforts of the attorneys representing the class have resulted in a judgment creating a fund for the benefit of the class. As noted by the court in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 111 (3rd Cir.1976):

Services performed in connection with the fee application are necessary to the attorney's recovery. They benefit *him,* and without them, the attorney cannot, since *Lindy I,* recover.

But such services do not benefit *the fund* —they do not create, increase, protect or preserve it. ... There being no benefit to the fund from services performed by appellees in connection with their fee application, there should be no attorneys' fee award from the fund for those services.

(Original emphasis). The similarity between the class action fund and the bankruptcy estate in this context is undeniable. *Contra Rose Pass Mines, Inc. v. Howard, supra* note 6, at 1092–1093.

fees on the matter are considered. ... Even under the special statutes which authorize attorneys' fees, such as the Civil Rights Statutes, attorneys' fees are only awarded to the prevailing party....

(Citation omitted). The court goes on to explain that if the attorney seeking compensation is always allowed to recover for pursuing an excessive fee application, a dangerous precedent will be established. Counsel will not be hesitant to request an excessive fee as there will be no risk. Either the court will allow the excessive fee of the attorney or the attorney will generate additional fees defending the fee application to replace those disallowed, both of which results are to the detriment of the bankruptcy estate. The same analysis applies with equal force to the attorney for the trustee, debtor or debtor-in-possession.

Accordingly, Rice, Hoppner's second fee application will be reduced by $5,122.50, the amount requested for preparing and defending its first fee application.

## TRAVEL EXPENSES INCURRED BY RICE, HOPPNER

The expenses incurred by the attorney for the debtor-in-possession must be actual and necessary, pursuant to the requirements of § 330.

■ Willner has objected to the travel expenses incurred by Rice contained in the second fee application as being unreasonable. No objection was made to the travel expenses requested on the first fee application, and Rice, Hoppner has had no opportunity to submit a breakdown of the expenses similar to that submitted with regard to the travel expenses requested on the second fee application. There has also been no opportunity for Rice, Hoppner to present evidence as to the necessity and reasonableness of the trips for which reimbursement is sought on the first fee application. Because expenses are not subject to a second review at the time of the final fee application as fees are, travel expenses in the amount of $5,821.89 on Rice, Hoppner's first fee application are disal-

lowed without prejudice to Rice, Hoppner to include them in a subsequent application with proper documentation.

Julian Rice made 14 trips between Fairbanks and Anchorage from August 15, 1983 to December 27, 1983, the time covered by the second fee application. As noted earlier, not all the expenses for each trip were billed to the debtor, but were prorated with other clients. The total travel expenses incurred for which reimbursement is sought in the second fee application are $2,752.97. As previously noted, Rice, Hoppner's offices are located in Fairbanks and the debtor is located in Anchorage. Although Rice, Hoppner submitted a memorandum in response to Willner's objection, there was no explanation given for the trips beyond a conclusory statement that Rice, Hoppner does not make unnecessary trips.

■ The burden of showing that the trips were actual and necessary rests on Rice, Hoppner. *See* page 429, *supra*. *See also In re Continental Illinois Securities Litigation*, 572 F.Supp. 931, 934 (N.D.Ill. 1983). Based on the statement of services rendered submitted with the second fee application, the Court holds that Rice, Hoppner has failed to show that all of Rice's trips were reasonable and necessary. Accordingly, some of the requested expenses will be disallowed.

■ Generally, Rice's trips can be broken into two categories: (1) those during which he negotiated with third parties and (2) those during which he merely conferred with the client and held telephone conferences or checked the Court's file. Negotiations with such parties as the Internal Revenue Service or the attorney for the labor unions require face-to-face conversation in order to obtain satisfactory results, and it is not unreasonable for the estate to bear the cost of those trips. Thus, the expenses incurred for the trips beginning August 30, September 8, September 20, November 8 and November 29, all of which were in 1983, are allowed. Rice, Hoppner will also be allowed the expenses incurred

in attending a court hearing on December 5, 1983.[15]

■ The remaining trips fall into the second category, and with one exception will be disallowed. Rice met with the client for one hour for each of the trips beginning August 22 and December 20, and two hours for the trip beginning October 24. The time billed for the trip beginning November 15 was 3 hours, but includes return travel of approximately one hour. Meetings with a client do not usually require that the attorney be physically present, as negotiations do. Because of the absence of any evidence from Rice, Hoppner as to why these short meetings could not have been accomplished with a telephone conference, the expenses for these trips will be disallowed. The time billed for the trip beginning August 15, however, was four hours and included a client conference and review of the Court's file. It does not seem reasonable to expect that a conference of that length should be held over a telephone, nor is it necessarily more economical. The August 15 trip will be allowed.

■ The only remaining trips for Julian Rice are those on October 18, November 1 and December 27, 1983. There was no time billed to the debtor for the November 1 trip, and thus no way to ascertain if it was necessary. The purpose of the December 27 trip, for which the estate was billed in full, was to spend one hour looking at the Court's file. Since there was no evidence showing why it was necessary to fly down just to look at the file, the expenses for this trip will be disallowed. The final trip was on October 18, and the debtor was billed a total of two hours for a client conference, a telephone conference and a conference with an Anchorage attorney about serving as an expert witness with regard to Rice, Hoppner's fees. Again, Rice, Hoppner has provided no evidence as to why a short personal meeting with the client was necessary. Moreover, the meeting with the Anchorage attorney with regard to the fee application is not properly charged to the debtor's estate, for the reasons given above. Thus, expenses for the October 18 trip will also be disallowed.

■ There are also travel expenses listed for Kenneth C. Ringstad for the months of August, November and December, 1983, for which reimbursement is sought on the second fee application. Unlike the travel expenses for Julian Rice which were detailed in an affidavit filed by Rice, Hoppner, the expenses for Kenneth Ringstad are only listed by a total amount for each of the three months. There is no specific date given and no other supporting documentation given by which the Court can judge the reasonableness of the expenses. Accordingly, the travel expenses for Kenneth Ringstad in the amount of $443.00 for which reimbursement is sought in the second fee application are denied without prejudice to Rice, Hoppner to resubmit these expenses with supporting documentation on a later application.

The disallowances described above total $1,645.66. Therefore, of the $4,415.49 in expenses claimed (for travel, copying, postage, long distance telephone calls, etc.) on the second fee application, $2,769.83 will be allowed.

### HOLD–BACK OF PORTION OF INTERIM FEE AWARD AND LIMITATION ON TOTAL INTERIM FEES TO BE ALLOWED

Under the Bankruptcy Act of 1898, there was no provision for the payment of interim fees. In situations of hardship where the attorney was working many hours on a case which would probably not be over for several years, the courts allowed interim fees to be paid to keep the case going. *See In re Imperial "400" National, Inc.*, 432 F.2d 232, 235–236 (3d Cir.1970); *In re Interstate Stores, Inc.*, 437 F.Supp. 14, 17 (S.D.N.Y.1977). With § 331, Congress

---

**15.** There was a settlement agreement with the unions which was considered by the court on the same date as the hearing on the objections to the first application for attorney's fees. Accordingly, Rice, Hoppner was required to be at the hearing to represent the debtor-in-possession and the travel expenses were necessary.

gave an explicit authorization that the courts may grant interim compensation. H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 330 (1978), S.Rep. No. 95–989, 95th Cong., 2d Sess. 41–42 (1978).

Section 331 does not require, however, that the Court shall grant the full amount of the interim fee, even if it is reasonable under § 330. The court in *In re Coconut Grove Bayshore, Inc.*, 33 B.R. 194, 195 (Bkrtcy.S.D.Fla.1983) points out that the general practice of the courts under the Act and which is unchanged by the Code is to allow "only such interim compensation as would almost certainly be allowed the applicant under all possible contingencies at the close of the case."[16] Under the rationale of *Coconut Grove*, after the court makes a determination as to the reasonableness of the fees requested, a second determination must be made as to how much should be paid as an interim allowance.

As noted above, it is often difficult to determine the value of an attorney's services, especially in a Chapter 11 proceeding, at least until a determination has been made as to whether a plan can be confirmed. As one commentator explains:

Usually the outcome of a reorganization case is not predictable at the time of its commencement. A reorganization plan may not be confirmed, or consummation may not be achieved with resultant dismissal or conversion to a liquidation case. Further, in a liquidation case or, perhaps, even in a successful reorganization case, the amount of monies or other assets available for the payment of administrative expenses, including compensation, may be limited.

2 *Collier on Bankruptcy* ¶ 331.01, 331–2 (15th Ed.1984).

It is only at the conclusion of the case that a determination of the full value of the services performed by the particular professional or fiduciary can be made, since only then is a thorough analysis by the court of the various relevant factors set forth in section 330 possible.

*Id.* at 331–8. The court in *In re Gloria Manufacturing Corp.*, 20 B.R. 603, 605, 9 B.C.D. 189, 6 C.B.C.2d 1028, CCH Bkr.L. Rpt. ¶ 68862 (Bkrtcy.E.D.Va.1982) also emphasized that it is more difficult to apply the criteria required by § 330 if compensation is "piecemealed" throughout the case, and that there is an inherent danger in awarding full interim compensation in every case as attorneys will become "... an hourly employee rather than a professional whose compensation is based on many worthy factors."

■ Interim fee awards may be adjusted by the court in making a final award. This was explained in *In re Callister*, 673 F.2d 305, 306–307 (10th Cir.1982) in which the court held that it had no jurisdiction to consider the appeal of an interim fee award:

The statute [§ 331] anticipates repeated application to the court for reimbursement and compensation, subjecting the award to amendment or modification at any time during the pendency of the bankruptcy proceedings. Interim awards, which are within the court's discretion, ... are to be considered by the court in making a final award. ... "Interim allowances are always subject to the court's re-examination and adjustment during the course of the case, and all expenses of administration must receive the court's final scrutiny and approval." *2 Collier on Bankruptcy* ¶ 331.03 (15th ed. 1981). Interim awards, too, are refundable to the estate in cases of misconduct.... Interim awards, then, are in no respect final adjudications on the question of compensation.

(Citations omitted). The reasoning of the court in *Callister* was approved by the court in *In re Yermakov, supra* at 1469.

■ The court is under a duty to review the reasonableness of the total fees paid pursuant to § 330 at the time of considera-

---

**16.** *Contra, In re Saxon Industries, Inc.*, 29 B.R. 319 (Bkrtcy.S.D.N.Y.1983) (in which the court allowed full payment absent a proper showing to the contrary).

tion of the final application.[17] There is the possibility in every case that a thorough analysis in regard to the final application using the factors set forth in § 330 and discussed earlier will show that the interim fees awarded were too high based on the end result, even though the fees appeared reasonable at the time they were awarded. In most cases, a hold-back of 25% of the interim fee as found to be reasonable will cover any changes occurring at the time of the review of the final fee application. It should be noted, however, that the amount held back will not be placed in escrow, and whether the amounts held back and allowed as part of the final fee award are actually paid will depend on the assets available for payment at that time.

The 25% figure is not an absolute, and may only be a starting point for analysis in some cases. There may be exceptional circumstances where it will be necessary to hold back less than 25% in order for the case to continue. It will be up to the attorney who makes such a request to clearly demonstrate that exceptional circumstances exist.

There will also be cases in which a hold-back of more than 25% will be appropriate. In *In re Codesco, Inc.*, 15 B.R. 354, 8 B.C.D. 482, 5. C.B.C.2d 738 (Bkrtcy.S.D.N.Y.1981), interim fees were requested by counsel for the creditors' committee. The reorganization was not going forward, and an application had been filed to convert the case to Chapter 7. The court refused to allow any interim fees to be paid, noting that any administrative expenses of the Chapter 7, if the case were converted, would have priority, and there were no unencumbered assets available for the payment of fees. A similar result was reached in *In re First Hartford Corporation*, 23 B.R. 729, 9 B.C.D. 1045, 7 C.B.C.2d 662 (Bkrtcy.S.D.N.Y.1982) in which a super priority claim had been granted to a creditor pursuant to § 364(c) before the application for interim fees was made. The court refused to allow payment of any interim fees as there were no assets which were unencumbered.

Another factor to be considered in determining the amount of interim compensation to be paid is whether there will be sufficient assets to cover all expenses of administration. In *In re Western Farmers Association*, 13 B.R. 132, 7 B.C.D. 1214 (Bkrtcy.W.D.Wash.1981), the court stated that the administrative expenses listed in § 503(b) including attorney's fees, are entitled to first priority pursuant to § 507(a). Section 726(b) provides that in a Chapter 7 case when there are inadequate funds to pay in full all members of a class, such as that of administrative expenses, the members of a class share pro rata. The *Western Farmers* court held that when there is a possibility that there will be insufficient assets in the estate to pay all administrative expenses, no interim fees will be awarded to an attorney to the prejudice of other administrative creditors.[18]

**17.** Section 328(a) also provides for a re-examination of fee agreements of professional persons employed by the trustee or debtor-in-possession pursuant to § 327:

The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light

of developments unanticipatable at the time of the fixing of such terms and conditions.

**18.** District of Alaska Local Bankruptcy Rule 23C provides that no interim fees shall be paid in a Chapter 7 proceeding unless the trustee files a certification that such a payment will not prejudice any party having a higher or equal priority or claim to the funds, unless the applicant can show the certification is being unreasonably withheld.

The court in Western Farmers distinguished the payment of debts incurred in the ordinary course of business, such as wages or utilities which are paid as they arise, from other administrative expenses which do not arise in the ordinary course of business and which must await payment until a later time. The fees incurred by attorneys are not incurred in the

In *In re Georgia Steel, Inc.*, 19 B.R. 834 (Bkrtcy.M.D.Ga.1982), the court allowed 75% of the compensation requested after determining that the application seemed reasonable. The court focused on four additional factors in making its determination: (1) the payment of attorney's fees would have to come from cash collateral of other creditors; (2) the secured creditors who were objecting to the payment had been benefited by the applicant's services only to the extent their collateral maintained a going concern value and new accounts receivable were generated; (3) the debtor had not filed a plan of reorganization and its financial position appeared tenuous, thus making it difficult for the court to determine the value of the applicant's services; and (4) the court did not want its award to destroy the incentive for counsel to diligently handle the case. *Id.* at 839.

In the instant case, no factors appear to be present that would require an extraordinary reduction in interim fees. Thus, the fees which the court has determined to be reasonable will be subject only to the basic 25% hold-back.

As the courts in *Western Farmers* and *Georgia Steel* note, the financial position of the debtor should be considered in setting interim fee awards. In a Chapter 7 case the attorney's fees will reduce the amount of liquidated assets available to satisfy the claims of the creditors. In a Chapter 11 case the interim fee awards will come either from the net income of the debtor or from the sale of non-essential assets, both of which place a strain on the debtor and reduce what is available to creditors should the case be converted to Chapter 7. As noted above, it is often difficult to tell

before the time of the final fee application whether the interim fees requested are reasonable. Accordingly, a limit should be placed on the total amount of interim fees awarded in order to protect the debtor-in-possession and the creditors in Chapter 11 cases and the creditors in Chapter 7 cases, absent a showing by counsel of extraordinary circumstances.

 For each order lodged for interim attorney's fees in a Chapter 7 case, counsel must certify on the bottom of the order that the total interim fees paid to date, including those for which the order is being sought, do not exceed 25% of the assets liquidated to date, exclusive of cash paid to secured creditors or assumptions of secured indebtedness. In Chapter 11 cases counsel must certify on the bottom of the order that the total interim fees paid to date, including those for which the order is being sought, do not exceed the greater of 10% of the debtor-in-possession's annual net income as reflected in the latest filed tax return,[19] or 10% of the total value of the debtor's assets based on the debtor's latest monthly report showing total asset value as required by Local Bankruptcy Rule 27, or the schedules on file if there is no such monthly report. The certifications in both Chapter 11 and Chapter 7 cases shall include the calculations upon which the certification is based. The 25% held back from the interim fee awards, as explained above, will not be included in the calculation of the total interim fees paid to date, as the 25% held back is not paid over as part of the interim fees. The 25% limitation on total interim fees in a Chapter 7 proceeding and the 10% limitation on total interim fees in a Chapter 11 proceeding will

ordinary course of business and the debtor-in-possession does not have authority to pay the attorney's fees absent a court order indicating compliance with the applicable statutory provisions. 13 B.R. at 135. It should be noted that Local Bankruptcy Rule 23D provides an incentive, in addition to the incentive provided by the holdback, for counsel to complete their cases, as it requires an attorney who does not remain as counsel for the trustee or debtor-in-possession until the conclusion of the case to refund 25% of all fees *received* from the estate.

19. The 10% may be of the accumulated net income during the pendency of the Chapter 11 as reflected in the income tax returns filed by the debtor-in-possession if the Chapter 11 has been pending for more than one year. For example, if a Chapter 11 has been pending for two years and the last two tax returns reflect a total net income of $150,000, the limitation would be based on the $150,000 total net income for the two years. Partial years may be prorated.

apply to all applications currently pending before the Court as well as those applications filed after the entry of the instant opinion, and those counsel with pending attorney's fee applications should lodge orders with the appropriate certification. The certification shall be in substantially the following form:

Chapter 7

Undersigned counsel hereby certifies that the attorney's fees set forth in the foregoing order, when added to any fees already paid, do not exceed 25% of the assets liquidated to date, exclusive of cash paid to secured creditors and assumptions of secured indebtedness, calculated as follows:

(a) _____Total dollar amount of assets liquidated to date exclusive of assumptions and payments to secured creditors

(b) _____Total fees paid on previous applications

(c) _____75% of fees requested in instant application

(b) + (c) = _____, which is less than 25% of (a) .

Chapter 11

Undersigned counsel hereby certifies that the attorney's fees set forth in the foregoing order, when added to any fees already paid, do not exceed the greater of 10% of the debtor-in-possession's annual net income based on the latest filed income tax return(s) or 10% of the total value of the debtor's assets, based on the debtor-in-possession's latest monthly report, or the schedules on file if there is no such monthly report, calculated as follows:

(a) _____Greater of the total annual net income or total value of assets as set forth in last filed of schedules or monthly reports

(b) _____Total fees paid on previous applications

(c) _____75% of fees requested in instant application

(b) + (c) = _____, which is less than 10% of (a) .

In the instant case, the overall limit on total interim fees to be paid will have no effect on the applications filed by Rice, Hoppner. In the monthly report of the debtor for May, 1984, the debtor showed assets of $761,171.00 and the file reflects net income of $111,940.00 for the twelve month period for which fees are being sought.[20] Ten percent of the debtor's assets, as the greater figure, is $76,117.00. The total interim fees awarded to Rice, Hoppner exclusive of the 25% hold-back, is $39,392.75.

CONCLUSION

In summary, $32,757.50 in attorney's fees and $1,381.28 in expenses on Rice, Hoppner's first application for attorney's fees and expenses is found to be reasonable. The disallowance of $5,821.89 of the expenses claimed on the first application is without prejudice to Rice, Hoppner to resubmit those expenses on a subsequent application with sufficient documentation to allow the Court to determine if the trips made were reasonable. The allowed expenses may be paid now. Of the pre-petition fees requested, $14,905.50 are disallowed without prejudice to Rice, Hoppner filing a general unsecured claim for that amount.

Pursuant to the 25% hold-back policy, $24,568.50 of the reasonable fees of $32,757.50 will be paid on the first application. The $15,000.00 retainer received by Rice, Hoppner will be applied first to the $6,037.50 in allowed pre-petition fees, and the remainder of the retainer will be offset against the post-petition fees, leaving a bal-

20. Because the debtor-in-possession is not required to file its income tax returns with the Court, the annual net income was calculated on the monthly reports during the period for which fees are being sought.

ance to be paid of $9,568.50.[21] The $8,189.00, which is being held back, will only be paid, if at all, after a review of the case is made at the time of hearing on the final application for fees.

Of the amount requested on Rice, Hoppner's second fee application, $19,766.25 in attorney's fees and $2,769.83 in expenses are found to be reasonable. The full amount of the expenses found to be reasonable may be paid at this time. A hold-back of 25%, or $4,942.00, will be made of the attorney's fees, leaving fees of $14,824.25 which may be paid now. The disallowance of travel expenses for Kenneth Ringstad in the amount of $443.00 is without prejudice to Rice, Hoppner to resubmit the expenses on a later application.

It should be noted on successive applications that the requirements set out in footnote 1 must be met. The items of service for which payment is sought must be explicitly set out and separately stated. The *actual* time spent for a particular service must be given. A designation of "research" will not be sufficient. Travel time will not be allowed absent exceptional circumstances. The time spent preparing fee applications will not be allowed. Orders lodged with the Court must contain a certification by counsel that the total interim fees paid do not exceed the 25% or 10% limit announced herein.

An order will be entered in accordance with this opinion.

---

**21.** Section 329(b) provides that if a retainer paid to the debtor's attorney exceeds the reasonable value of the services rendered, the court may order the amount in excess of the reasonable value returned to the estate. A strict construction of this provision would require Rice, Hoppner to return the amount of the retainer in excess of the pre-petition fees allowed to the debtor, even though Rice, Hoppner is owed fees under § 330 for services performed for the debtor-in-possession. A more reasonable alternative is to allow the amount of the retainer found to be excessive under § 329 to be offset against the amount owed to the attorney under § 330. *See In re G.W.C. Financial & Insurance Services, Inc.,* 8 B.R. 122, 127 (Bkrtcy.C.D.Ca.1981).